No. 300.   MARYLAND *v.* BALTIMORE RADIO SHOW, INC.
ET AL.   Court of Appeals of Maryland.   Certiorari de-
nied.   MR. JUSTICE FRANKFURTER has filed an opinion
respecting the denial of the petition for writ of certiorari.
*Hall Hammond,* Attorney General of Maryland, and *Har-
rison L. Winter,* Assistant Attorney General, for peti-
tioner.   *J. Purdon Wright* and *W. Frank Every* for re-
spondents.   *Elisha Hanson, William K. Van Allen* and
*Arthur B. Hanson* filed a brief for the American News-
paper Publishers Association, as *amicus curiae,* opposing
the petition.

Opinion of MR. JUSTICE FRANKFURTER respecting the
denial of the petition for writ of certiorari.

The Criminal Court of Baltimore City found the re-
spondents guilty of contempt and imposed fines for broad-
casting over local radio stations matter relating to one
Eugene H. James at a time when he was in custody on
a charge of murder.   The facts upon which these findings
were based are best narrated in the authoritative state-
ment of the trial court:

> "A little girl in one of the parks of Washington, D. C.,
> had been murdered under horrible and tragic cir-
> cumstances.   Some ten days later, little Marsha Brill
> was dragged from her bicycle on one of the public
> thoroughfares of Baltimore City while in the com-
> pany, or at least, in the vicinity of two of her play-
> mates, and there stabbed to death.   The impact of
> those two similar crimes upon the public mind was
> terrific.   The people throughout the City were out-
> raged.   Not only were they outraged but they were
> terrified.   Certainly, any parent of a young child

must have felt a dread at the thought that his or her child might be killed while out upon the thoroughfares of Baltimore City. We think we are justified in drawing the conclusion that there was widespread and compelling public interest in the Brill murder. We think we are justified in assuming that many, many ears were on that evening in Baltimore, glued to their radios. And what happened? Mr. Connelly goes on the air and announces 'Stand by for a sensation.' Now, gentlemen, it is a fair and safe bet that whatever the Hooper-rating of his station may be, no listener tuned to his station was going to turn his radio off when he heard that announcement. Mr. Connelly then proceeded to explain that James had been apprehended and that he had been charged with the Brill murder. That was all right. Nobody could quarrel with that, but then he goes on to say that James had confessed to this dastardly crime, that he has a long criminal record, that he went out to the scene with the officers and there re-enacted the crime, and further, dug up from somewhere down in the leaves the knife that he had used to murder the little girl. Now, gentlemen, the Court has no difficulty in concluding that the broadcast was devastating. Anybody who heard it would never forget it. The question then before us is: Did that broadcast and others which were less damaging by the other stations, have a clear and present effect upon the administration of justice? The Court is bound to say that we do not believe that those broadcasts had any appreciable effect to say nothing of constituting a clear and present danger, upon the decision of the Judges who tried the case. At the moment we do not recall just who those Judges were, but Judges are supposed to be made of sterner stuff than to be influenced by irresponsible statements regarding pend-

ing cases. They are trained to put aside inadmissible evidence and while we, of course, recognize our limitations, I think that most Judges, at least, are fairly able to disregard improper influences which may have reached their attention.

"Now, what about the jury? In the first place, what is this jury that we are talking about? They are twelve men, or in most jurisdictions now, as in Maryland, men and women who are picked from all walks of life and who have the responsibility of hearing cases and determining, in this State at least, not only the facts but the law in the case. It may be unfortunate, perhaps, but certainly the fact is that the jury's verdict is final in most cases. There is the limited protection of the accused to apply for a new trial, but the Court of Appeals can not determine—review and determine—the propriety of the verdict reached by the jury either on the law or on the facts. Now this jury system is intended, and I think it works out that way, to bring to the trial of a case as one element, the public opinion in the community. It is true that the jury is sworn to decide the case upon the evidence which it hears from the witness stand, but I think that no experienced lawyer would contend that a jury is not expected to bring to the consideration of its verdict the temperament of the community in which the members of the jury live. The jury is called upon to decide the facts as it hears them from the witness stand in the light of its past experience and, if you please, its past knowledge. True, attempts are made to get jurors who have not been touched with any previous influence in the case, but the safeguards that are provided for the realization of that ideal are all too limited.

"The Court knows no graver responsibility that devolves upon Counsel for the Defense in a serious

criminal case than the responsibility of advising his client whether to elect a jury trial or a court trial. Counsel must be able to sense public opinion, and he must evaluate the possible effect upon the jurors' minds of those things which they know or think they know. Doubtless, all of us have seen cases tried in which we felt that the Counsel made errors of judgment as to how the particular cases ought to be tried. They are, however, doing the best that they can and, as I have indicated, theirs is a grave responsibility, because it is irrevocable. When a jury determines a case that terminates the case and if Counsel may have made an unfortunate choice then his client suffers the consequences.

"Now, the Court can not help but feel that the broadcast referred to in these cases must have had an indelible effect upon the public mind and that that effect was one that was bound to follow the members of the panel into the jury room. The Court hardly needs evidence in this factual situation to reach the conclusion that James' free choice to either a court trial on the one hand and a jury trial on the other, has been clearly and definitely interfered with. However, we do have the testimony of his Counsel, Mr. Murphy, (and we are bound to say that his testimony seemed to be reasonable and persuasive) who told the Court that he felt that he had no choice. He simply could not afford to subject his client to the risk of trying his case before a jury in a community where this extraneous and improper matter had been broadcast. He did, in fact, elect a court trial, but he did not have any alternative, according to his Counsel, and the Court is bound to say that we agree with his Counsel. The suggestion has been made here that the right to a jury trial could have been protected by the right of removal and in this case

he did have the right, the Constitutional right, of removal. We assume that the Court would have sent the case to some other Circuit for trial but Mr. Murphy says that there were some Counties in the State where he did not want to send his client for a jury trial. Not only that, but many parts of the State were blanketed by the same broadcast information that was available to the people of the City of Baltimore. Counsel said that at least one of the stations had a radius of seven hundred and fifty miles.

"The suggestion was made here also, that the mischief could have been avoided by exercising the right of the Defense to examine, on their voir dire, all prospective jurors and then inquiring as to whether or not they had heard these broadcasts. Well, now, it hardly seems necessary for the Court to say to men who are experienced in the trial of jury cases, that every time Defense Counsel asked a prospective juror whether he had heard a radio broadcast to the effect that his client has confessed to this crime or that he has been guilty of similar crimes, he would by that act be driving just one more nail into James' coffin. We think, therefore, that remedy was useless.

"Now, gentlemen, the Court must conclude that these broadcasts did constitute, not merely a clear and present danger to the administration of justice, but an actual obstruction of the administration of justice, in that they deprived the Defendant, James, of his Constitutional right to have an impartial jury trial."

The Court of Appeals of Maryland reversed these convictions. 67 A. 2d 497. It did so by sustaining "the chief contention of the appellants, that the power to punish for contempt is limited by the First and Fourteenth Amendments to the Federal Constitution, and that the facts in the case at bar cannot support the judgments,

in the light of those amendments, as authoritatively construed by the Supreme Court." 67 A. 2d at 507. The decision of the Court of Appeals was thus summarized in the dissenting opinion of Judge Markell:

> "This court holds that under the decisions of the Supreme Court (*Bridges* v. *California,* 314 U. S. 252; *Pennekamp* v. *Florida,* 328 U. S. 331, and *Craig* v. *Harney,* 331 U. S. 367) the judgments below violate the freedom of speech and of the press under the Fourteenth Amendment. If this is the correct interpretation of these decisions, of course they are conclusive." 67 A. 2d at 518.

Thereupon the State of Maryland asked this Court to issue a writ of certiorari to review the decision of its Court of Appeals. In its petition Maryland urges that while the Court of Appeals was of course bound by the decisions of this Court, that court misconceived our rulings, that the interpretation which it placed upon the *Bridges, Pennekamp* and *Craig* cases was not correct, with the result that it erroneously reversed the judgments for contempt. Since the court below reached its conclusions on a misconception of federal law, so the State of Maryland argues, only this Court can release the Maryland court from its bondage of error.

This Court now declines to review the decision of the Maryland Court of Appeals. The sole significance of such denial of a petition for writ of certiorari need not be elucidated to those versed in the Court's procedures. It simply means that fewer than four members of the Court deemed it desirable to review a decision of the lower court as a matter "of sound judicial discretion." Rule 38, paragraph 5. A variety of considerations underlie denials of the writ, and as to the same petition different reasons may lead different Justices to the same result. This is especially true of petitions for review on writ of certiorari to a State court. Narrowly technical reasons

918

may lead to denials. Review may be sought too late; the judgment of the lower court may not be final; it may not be the judgment of a State court of last resort; the decision may be supportable as a matter of State law, not subject to review by this Court, even though the State court also passed on issues of federal law. A decision may satisfy all these technical requirements and yet may commend itself for review to fewer than four members of the Court. Pertinent considerations of judicial policy here come into play. A case may raise an important question but the record may be cloudy. It may be desirable to have different aspects of an issue further illumined by the lower courts. Wise adjudication has its own time for ripening.

Since there are these conflicting and, to the uninformed, even confusing reasons for denying petitions for certiorari, it has been suggested from time to time that the Court indicate its reasons for denial. Practical considerations preclude. In order that the Court may be enabled to discharge its indispensable duties, Congress has placed the control of the Court's business, in effect, within the Court's discretion. During the last three terms the Court disposed of 260, 217, 224 cases, respectively, on their merits. For the same three terms the Court denied, respectively, 1,260, 1,105, 1,189 petitions calling for discretionary review. If the Court is to do its work it would not be feasible to give reasons, however brief, for refusing to take these cases. The time that would be required is prohibitive, apart from the fact as already indicated that different reasons not infrequently move different members of the Court in concluding that a particular case at a particular time makes review undesirable. It becomes relevant here to note that failure to record a dissent from a denial of a petition for writ of certiorari in nowise implies that only the member of the Court who notes his dissent thought the petition should be granted.

Inasmuch, therefore, as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated.

The one thing that can be said with certainty about the Court's denial of Maryland's petition in this case is that it does not remotely imply approval or disapproval of what was said by the Court of Appeals of Maryland. The issues canvassed in the opinions of that court, and which the State of Maryland has asked us to review, are of a nature which very readily lend themselves to misconstruction of the denial of this petition. The present instance is peculiarly one where the redundant becomes the necessary.

It becomes necessary to say that denial of this petition carries no support whatever for concluding that either the majority or the dissent in the court below correctly interpreted the scope of our decisions in *Bridges* v. *California,* 314 U. S. 252; *Pennekamp* v. *Florida,* 328 U. S. 331; and *Craig* v. *Harney,* 331 U. S. 367. It does not carry any implication that either, or neither, opinion below correctly applied those decisions to the facts in the case at bar.

The issues considered by the Court of Appeals bear on some of the basic problems of a democratic society. Freedom of the press, properly conceived, is basic to our constitutional system. Safeguards for the fair administration of criminal justice are enshrined in our Bill of Rights. Respect for both of these indispensable elements of our constitutional system presents some of the most difficult and delicate problems for adjudication when they are before the Court for adjudication. It has taken centuries of struggle to evolve our system for bringing the

guilty to book, protecting the innocent, and maintaining the interests of society consonant with our democratic professions. One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right. On the other hand our society has set apart court and jury as the tribunal for determining guilt or innocence on the basis of evidence adduced in court, so far as it is humanly possible. It would be the grossest perversion of all that Mr. Justice Holmes represents to suggest that it is also true of the thought behind a criminal charge ". . . that the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams* v. *United States,* 250 U. S. 616, 630. Proceedings for the determination of guilt or innocence in open court before a jury are not in competition with any other means for establishing the charge.

I have set forth in an appendix the course of recent English decisions dealing with situations in which publications were claimed to have injuriously affected the prosecutions for crime awaiting jury determination. (As to freedom of press in England, see Report of the Royal Commission on the Press, Cmd. No. 7700, and the debate thereon in the House of Commons, July 28, 1949. 467 H. C. Deb. (5th ser.) 2683–2794.) Reference is made to this body of experience merely for the purpose of indicating the kind of questions that would have to be faced were we called upon to pass on the limits that the Fourteenth Amendment places upon the power of States to safeguard the fair administration of criminal justice by jury trial from mutilation or distortion by extraneous influences. These are issues that this Court has not yet adjudicated. It is not to be supposed that by implication it means to adjudicate them by refusing to adjudicate.

APPENDIX TO OPINION OF FRANKFURTER, J.

*English decisions concerning contempt of court for comments prejudicial to the fair administration of criminal justice.*

A. CASES FINDING CONTEMPT.

1. *King* v. *Tibbits and Windust*, [1902] K. B. 77 (1901). The judgment of the court (Lord Alverstone C. J., and Wills, Grantham, Kennedy and Ridley JJ.) was read by Lord Alverstone C. J. The case is adequately summarized in the headnote:

> "During the course of the trial of two persons for felony the reporter for a certain newspaper sent to the editor articles affecting the conduct and character of the persons under trial which would have been inadmissible in evidence against them. The editor published the articles, and, after the conviction and sentence of the two persons, he and the reporter were convicted on an indictment charging them with unlawfully attempting to pervert the course of justice by publishing the articles in question and with conspiring to do so:—
> "*Held,* that the conviction must be affirmed."

Each of the defendants was sentenced to six weeks' imprisonment on each count of the indictment, the sentences to run concurrently.

2. *King* v. *Parke*, [1903] 2 K. B. 432 (Lord Alverstone C. J., Wills and Channell JJ.). Rule for contempt of court for publication of statements by a newspaper, before the accused's commitment for trial, that he had engaged in immoral conduct and had admitted a prior conviction and imprisonmment for forgery. Answering the argument that publication before commitment was not a contempt, the court through Wills J. said:

> "A moment's consideration, it seems to us, is sufficient to dispose of such a proposition. The reason why the publication of articles like those with which we have to deal is treated as a contempt of Court is because their tendency and sometimes their object is to deprive the Court of the power of doing that which is the end for which it exists—namely, to administer justice duly, impartially, and with reference solely to the facts judicially brought before it. Their tendency is to reduce the

Court which has to try the case to impotence, so far as the effectual elimination of prejudice and prepossession is concerned [pp. 436–37]."

The rule was made absolute, and a fine of £50 imposed.

3. *King* v. *Davies,* [1906] 1 K. B. 32 (1905) (Lord Alverstone C. J., Wills and Darling JJ.). Rule for contempt of court for publication in a newspaper of statements that a woman, then under arrest on a charge of abandoning a child but not committed for trial for attempted murder of the child until after the publication, had practiced wholesale baby farming and had been convicted of fraud. In delivering the judgment of the court, Wills J. relied on *King* v. *Parke, supra:*

"We adhere to the view we expressed in that case that the publication of such articles is a contempt of the Court which ultimately tries the case after committal, although at the time when they are published it cannot be known whether there will be a committal or not. Their tendency is to poison the stream of justice in that Court, though at the time of their publication the stream had not reached it . . . [p. 35]."

The rule was made absolute, and a fine of £100 imposed.

4. *Rex* v. *Clarke,* 27 T. L. R. 32 (K. B. 1910) (Darling, Pickford and Coleridge JJ.). Rule *nisi* for contempt of court based on a statement published in a newspaper that one Crippen had confessed to having killed his wife, but had denied the act was murder. Crippen was at the time in custody though not yet formally charged.

During the course of the argument, Darling J. stated:

"Even if a confession had really been made, it might still have been contempt to publish it; it might have been of such a kind as to be inadmissible in evidence [p. 33]."

The pertinent part of the judgment of the court, delivered through Darling J., was thus reported:

"In the present case, after the man was in custody the newspaper commented upon the case as to whether he had committed the crime, not to assist in unravelling the case. It was merely an attempt to minister to the idle curiosity of people as to what was passing within the prison before the trial took place. A news agent procured various telegrams from Quebec, and, when he did not get enough, he telegraphed for 1,000 words more.

The *Daily Chronicle* published a telegram from Quebec stating:—'It is generally considered here that the formal official denials that Crippen has made a confession hinge upon a distinction between the words "admission" and "confession."' Whether it was an admission or confession the effect on the prisoner would be the same. The telegram went on:—'It is quite possible that what Crippen said may not be regarded officially as a confession, especially as he declared that he was not a "murderer," but that the prisoner made a statement to Inspector Dew last Monday I have reason to feel certain. I have confidence in the authority on which I cabled you the information sent last night, and I am assured to-day from the same source that Crippen admitted in the presence of witnesses that he had killed his wife, but denied that the act was murder,' and finishing up with stating that his wife died from an operation. Anything more calculated to prejudice a defence could not be imagined. The jurors were drawn from the county of Middlesex, where this paper was widely circulated.

"The Court had come to the conclusion that a contempt of the Court had been committed in the publication of this matter, and that it was a very grave contempt. It was most important that the administration of justice in the country should not be hampered. To hold otherwise would be to narrow the jurisdiction of the Court, and his Lordship added that, so long as they sat there, they were determined that trial by newspaper should not be substituted for trial by jury. The primary punishment in a case of this kind was imprisonment. The Court could not be blind to the fact that newspapers were frequently owned by wealthy people who would take their chance and cheerfully pay any fines that might be inflicted for the sake of the advertisement. If this practice was not stopped the Court would have to inflict the primary punishment. But the Court did not intend to do so in the present case. Mr. Perris had seen that he was in the wrong and had apologized. The apology was due to the people wronged and to the public. The Court had no feeling in regard to the matter. The Court therefore did not punish him as if he persisted in his wrongdoing. But, notwithstanding this, a very grave offence had been committed. His Lordship expressed the hope that what he had said and what would be said would be the means of putting a stop to this kind of thing. The order of the Court was that Mr. Perris

should pay to the Court £200 and the costs, and that he should be imprisoned until the sum was paid [pp. 34–35]."

5. *Rex* v. *Astor*, 30 T. L. R. 10 (K. B. 1913) (Ridley, Scrutton and Bailhache JJ.). Rules *nisi* for contempt of court for comments in the *Pall Mall Gazette* and the *Globe* about a trial for criminal libel and a private shareholders' suit, both relating to the same person and to the same transaction. The proceedings are reported in part as follows:

"Counsel continuing said that if the rule was made absolute it would amount to an embargo on the Press, when a trial was pending, from publishing any item of news which could in any way be thought to prejudice the trial. It would be a very poor compliment to the jury to suppose that they would be influenced by the paragraph.

"MR. JUSTICE SCRUTTON [referring to the *Gazette*] said that if a paper took upon itself to mix up together the reports of criminal proceedings and of civil proceedings relating to the same share transaction, he could come to no other conclusion than that it might tend to prejudice the jury trying the case, who were not trained lawyers able to distinguish the exact relevance of a charge of that kind. But he agreed that, having made ample apologies, the respondents need only pay the costs [p. 12]."

With respect to the comments in the *Globe* the rule was discharged without costs, since the comments on the criminal and civil proceedings were printed in separate portions of the paper.

6. *Rex* v. *J. G. Hammond & Co.*, 30 T. L. R. 491 (K. B. 1914) (Darling, Avory and Rowlatt JJ.). Rule *nisi* for contempt of court for the publication of comments on a prosecution for perjury then in progress before the magistrate:

"Dealing with the main question in the case, he (Mr. Justice Darling) said he could not entertain the slightest doubt that the comments made in *Modern Society* were a contempt of Court. It seemed to him that they were absolutely intended to damage the prosecutor, Sir J. B. Robinson, and to glorify and extol Mr. Louis Cohen. That being so they were clearly calculated to prejudice the conduct of the trial, and were therefore a contempt of Court. He could not accept as sincere the expressions of regret made by the two companies and by Mr. Harris in the affidavits read to them. The judgment of the Court would be

that Mr. Harris must pay a fine of £50 and the costs of the proceedings. Harris was out of the jurisdiction at present and it was necessary that the order of the Court should be in a particular form. The rule would be made absolute against him, but the writ of attachment would be superseded if he paid the fine of £50. With regard to the two limited companies, in their judgment there was nothing to be said in mitigation of the offence which they had committed, and the order with regard to each would be that they must pay a fine of £50 and the costs of the proceedings, the fine to be levied upon the goods of the respective companies [p. 492]."

7. *Rex* v. *Editor and Printers and Publishers of the Evening Standard*, 40 T. L. R. 833 (K. B. 1924) (Lord Hewart C. J., Roche and Branson JJ.). Rules *nisi* for contempt of court based upon statements printed in three newspapers, the *Evening Standard, Manchester Guardian* and *Daily Express*. The *Standard* had hired amateur detectives to investigate a killing and published what was uncovered at a time when a charge of murder had been made and a trial was to take place. The judgment of the court was delivered through the Lord Chief Justice and reported in part as follows:

"It was urged on behalf of one respondent on the previous day that it was part of the duty of a newspaper when a criminal case was pending to elucidate the facts. If he understood that suggestion when clearly expressed it came to something like this; that while the police or the Criminal Investigation Department were to pursue their investigations in silence and with all reticence and reserve, being careful to say nothing to prejudice the trial of the case, whether from the point of view of the prosecution or the point of view of the defence, it had come to be somehow for some reason the duty of newspapers to employ an independent staff of amateur detectives, who would bring to an ignorance of the law of evidence a complete disregard of the interests whether of the prosecution or the defence. They were to conduct their investigation unfettered, to publish to the whole world from time to time the results of these investigations, whether they conceived them to be successful or unsuccessful results, and by so doing to perform what was represented as a duty, and, one could not help thinking, to cater for the public appetite for sensational matter.

"It was not possible for that Court, nor had it any inclination, to suggest to the responsible editors of those newspapers what

were the lines on which they ought to proceed. Any such task as that was entirely beyond the province of that or any other tribunal. Those who had to judge by the results could see what a perilous enterprise this kind of publication was. It was not possible even for the most ingenious mind to anticipate with certainty what were to be the real issues, to say nothing of the more difficult question what was to be the relative importance of different issues in a trial which was about to take place. It might be that a date, a place, or a letter, or some other one thing which, considered in itself, looked trivial, might prove in the end to be a matter of paramount importance. It was impossible to foresee what was important [p. 835].

. . . . .

"His Lordship added that in all the cases the fines would be increased by the payment of costs. He said that nobody who knew anything of the organization and management of a news-paper office could be ignorant of the fact that the work of news-papers was very often done in circumstances of great hurry by many different minds not always fully aware of what others might be doing. The result was a composite thing, but there must be central responsibility. It was impossible to say that men occupying responsible positions should be excused because they themselves were not personally aware of what was being done. The practice was really becoming prevalent, and it was quite obvious that there were those who thought that publica-tions of this kind were not only legitimate, but even commend-able. In the hope that that day's proceedings would show that in the opinion of that Court that view was entirely wrong, the Court had merely imposed a fine, but if the practice were re-peated the Court would not again be disposed to adopt that merciful alternative [p. 836]."

The rules were made absolute, and fines imposed of £1,000 for the acts of the *Evening Standard* and £300 each for the statements in the *Manchester Guardian* and *Daily Express*.

8. *Rex* v. *Editor, Printers and Publishers of the Daily Herald,* 75 Sol. J. 119 (K. B. 1931) (Lord Hewart C. J., Avory and MacKinnon JJ.). Rule *nisi* for contempt for publishing a poster, which in fact related to another case, containing the words "Another Blazing Car Murder" at a time when an accused stood committed for trial on

the charge of murder of a man in a motor car found burned up. As is the practice in all these cases the respondents tendered full apology to the court. In delivering the judgment, Lord Hewart C. J. stated that the poster words might suggest that the accused had committed murder which was the issue the jury had to decide. The rule was made absolute, but only costs were assessed.

9. *Rex* v. *Editor, Printer and Publisher of the Surrey Comet*, 75 Sol. J. 311 (K. B. 1931) (Lord Hewart C. J., Avory and Humphreys JJ.). Rule *nisi* for contempt of court. The judgment of the court is summarized as follows:

> "Lord HEWART, C. J., said that the point was whether something had been published which might prejudice the trial of an accused man. In the article complained of there was a long account, carefully got together, which included at least three statements of grave prejudice against the man who afterwards was charged. A newspaper was entitled to report, fairly and accurately, what took place in open court, but, in the present case, *ex concessio*, nothing had taken place in court, and there was no question of reporting proceedings in court. The newspaper had busied itself in the deplorable enterprise of collecting materials which might be thought to be of interest concerning that which had been done and the person who, it was expected, would be accused. Once a newspaper departed from a fair and accurate report of what was actually stated in open court it not only took a great risk itself, but it also imperilled the unfortunate man, guilty or innocent, who was charged. For what had been done in the present case there was no conceivable excuse. His lordship added that if that kind of cynical indifference for the interests of accused persons continued to be displayed, cases would not be met by the imposition of fines. He hoped that the case would have the effect of attracting the attention of professional journalists to the utter impropriety of an enterprise of that character. The rule would be made absolute against the editor of the newspaper, the costs paid as between solicitor and client, and the editor would be fined £500 [pp. 311–12]."

10. *Rex* v. *Hutchison*, [1936] 2 All Eng. 1514 (K. B.) (Swift, Humphreys and Goddard JJ.). Rules *nisi* for contempt of court for showing a news film of the arrest of a man, subsequently charged with unlawful possession of firearms, with the caption: "Attempt on the

King's life." The arrest had been made after a revolver fell close to the King's horse during a procession in which the King was riding, and it was widely feared that an attempt had been made on the King's life. Swift J. delivered the judgment of the court making the rules absolute on the ground that the caption was likely to bring about "derangement in the carriage of justice" (p. 1515). Because of their apologies only costs were assessed against some respondents, but another was fined £50 and costs "to mark the court's disapproval of their conduct" (p. 1515).

11. *Rex* v. *Editor, Printers and Publishers of the Evening News,* The Times (London), July 30, 1936, p. 4, col. 3 (K. B.) (Swift, Humphreys and Goddard JJ.). Rule *nisi* for contempt of court for publishing articles describing as a "crank" and a person regarded by the police as a "harmless lunatic nursing a grievance" someone under arrest for unlawful possession of firearms. He was the same accused about whom the news film in *Rex* v. *Hutchison, supra,* was shown. The court's decision is summarized as follows:

"MR. JUSTICE SWIFT, in giving judgment, said that proceedings for contempt of Court were not taken to vindicate the dignity of the Court or the person of a Judge, but to prevent undue interference with the administration of justice. It was essential that when a criminal charge was made against any one there should be no tampering of any sort or kind with those who would ultimately have to decide the matter.

"It was not disputed that the article complained of was a gross contempt of Court in the sense that it was bound to influence the minds of those who read it against the man who was accused of a crime before he could be brought to trial.

"The Court thought that it was an extremely serious matter; but it took into account the unqualified, unreserved, and sincere apology which had been made for what had been done. The Court also recognized that there might have been circumstances which alleviated part, but only part, of what had been published. No regard seemed to have been paid by the newspaper to the position of the accused man at all. His state of mind, his conduct in the past, the names under which he had gone, whether the statements made were true or untrue, were all put before the public and those members of the public who would ultimately form the tribunal to try him.

"The judgment of the Court would be that the rule should be made absolute and that the editor and the printers and

publishers of the newspaper should each be fined £500, and be ordered to pay the costs of the application."

12. *King* v. *Daily Mirror*, [1927] 1 K. B. 845. Rules *nisi* for contempt of court for publishing in a newspaper the photograph of a person charged with a criminal offense. The bearing of such publication on the fairness of a later trial is sufficiently indicated in the judgment of Lord Hewart C. J., with whom Avory and Talbot JJ. concurred:

"The phrase 'contempt of court,' as has been observed more than once, is, in relation to the kind of subject-matter with which we are now concerned, a little misleading. The mischief referred to consists, not in some attitude towards the Court itself, but in conduct tending to prejudice the position of an accused person. In other words, what is really in question is nothing attacking the status of the Court as a court, but something which may profoundly affect the rights of citizens [p. 847].

.         .         .         .         .

"Nobody would excuse a police officer in the conduct of a case if, collecting together all the various persons among whom identifying witnesses might be found, he said: 'I have arrested a man, and I am going to put him up for identification by you,' and then showed to those persons a photograph of the suspected person. The unfairness of that course is manifest, because the witness approaches the difficult and it may be the crucial task of identification with his mind prejudiced by the knowledge that this particular person has been arrested and is in the hands of the police. What does a newspaper do when it prints a photograph in these circumstances? It invites the whole country to scrutinize the features of the accused who has been arrested. That it does that act not in the course of preparation of the case for the prosecution but merely in the course of the conduct of a money-making business does not excuse in a newspaper that which would be reprehensible in a police officer. In my opinion, in the publication of a photograph no less than in narrative, it is the duty of a newspaper to take care to avoid publishing that which is calculated to prejudice a fair trial. To approach the matter in a mood of cynical indifference is obviously wrong. There is a duty to take care lest, by the publication of matter, whether in the form of a photograph or of printed words, prejudice should be caused to a person about

to stand his trial. That of course does not mean, nor am I for a moment suggesting, that a newspaper is not entitled in any circumstances to publish a photograph of a person who is a party to either civil or criminal proceedings. But I am no less clear upon the point that there is a duty to refrain from the publication of the photograph of an accused person where it is apparent to a reasonable man that a question of identity may arise. If in these circumstances a newspaper prints a photograph it is taking a grave risk, which in one sense affects the accused person, and in another sense affects the newspaper [pp. 849–50]."

The rules were made absolute, but, since this was the first occasion upon which the question arose with respect to the publication of a photograph of an accused person, only costs were assessed.

13. The Times (London), Mar. 26, 1949, p. 3, col. 1, reported the recent case arising out of the prosecution of Haigh, the so-called Bluebeard, as follows:

"A DIVISIONAL COURT of the KING'S BENCH—the Lord Chief Justice [Goddard], Mr. Justice Humphreys, and Mr. Justice Birkett—yesterday, on the two motions for writs of attachment for contempt of Court made on behalf of John George Haigh (who is at present in custody on a charge of murdering Mrs. Olive Durand-Deacon) against Mr. Silvester Bolam, the editor of the *Daily Mirror,* and Daily Mirror Newspapers, Limited, the COURT ordered that Mr. Bolam should be committed to prison for three calendar months, and that the company should pay a fine of £10,000 and the costs of the proceedings.

.              .              .              .              .

"The LORD CHIEF JUSTICE, delivering the judgment of the Court, said that Sir Walter Monckton had moved for a writ of attachment against Mr. Silvester Bolam, the editor of the *Daily Mirror,* for contempt of Court. In view of the gravity of the case the Court directed that the proprietors of the newspaper, a limited company, Daily Mirror Newspapers, Limited, should also be summoned before the Court to answer for the contempt committed by the publication in the newspaper of the matters complained of. It appeared that a man named Haigh had been arrested and charged with murder. He had been brought before the examining justices at Horsham and the case had not yet been opened. No more was known than that he had been charged with murder.

"On March 4 three issues of the *Daily Mirror* were published—three separate editions. Those editions contained articles, photographs, and headlines in the largest possible type, of a character which the Court could only describe as a disgrace to English journalism as violating every principle of justice and fair play which it had been the pride of this country to extend to the worst of criminals.

" 'To use the language of Lord Hardwicke in 1742, in the case of the *St. James's Evening Post*—it is a case of prejudicing mankind against persons before their case is heard.'

"Any one who had had the misfortune, as the members of the Court had, to read the articles must be left wondering how it could be possible for this man to obtain a fair trial after what had been published. Not only did the articles describe him as a vampire and give reasons for that description of him, but, after saying that he had been charged with one murder, they went on to say not merely that he was charged with other murders but that he had committed others and gave the names of persons whom, they said, he had murdered. A photograph was given of a person whom he was said to have murdered, with a description of the way in which the crime was committed.

"In the long history of the present class of case there had never, in the opinion of the Court, been one of such gravity as this, or one of such a scandalous and wicked character. It was of the utmost importance that the Court should vindicate the common principles of justice and, in the public interest, see that condign punishment was meted out to persons guilty of such conduct. In the opinion of the Court what had been done was not the result of an error of judgment but was done as a matter of policy in pandering to sensationalism for the purpose of increasing the circulation of the newspaper.

"After it had come to the knowledge of the Commissioner of Police that the *Daily Mirror* or some other paper might be likely to publish some details of the case, in the course of the evening a warning was sent from the office of the Commissioner of Police to this newspaper. That that had any real effect on this newspaper, in spite of what had been said in the affidavit, it was difficult to believe. It was true that there was some, but very little, alteration in the last edition. That edition was itself a gross contempt, not perhaps quite so bad as the other two which had been issued. The fact that the police had given a warning did not affect the question one way or the other. It

was an offence whether notice had been given or not. It might aggravate the case that more attention was not paid to the warning.

"As he had said, in view of the gravity of the case the Court had ordered the proprietors of the newspaper to be brought before the Court. He would add a word of warning: let the directors beware; they knew now the conduct of which their employees were capable, and the view which the Court took of the matter. If for the purpose of increasing the circulation of their paper they should again venture to publish such matter as this, the directors themselves might find that the arm of that Court was long enough to reach them and to deal with them individually. The Court had taken the view that there must be severe punishment.

"His LORDSHIP then called on Mr. Bolam to stand up, and, addressing him, said: 'The writ of attachment will be issued, and you will be taken in the custody of the tipstaff and committed to Brixton Prison for three calendar months.'

"Continuing, his LORDSHIP said that the respondent company would be fined £10,000 and pay the costs of the proceedings." [1]

### B. CASES FINDING NO CONTEMPT.

1. *Rex* v. *Editor and Publishers of The People,* The Times (London), April 7, 1925, p. 5, col. 4 (K. B.) (Lord Hewart C. J., Shearman and Salter JJ.). Rule for contempt for publication of articles accusing one Hobbs of diabolical roguery and calling him the "wizard crook of the underworld." The articles were published after Hobbs' conviction for conspiracy to defraud another, but it was alleged that they were calculated to prejudice the hearing of the appeal. The relevant part of the judgment is reported as follows:

"The LORD CHIEF JUSTICE, in his judgment, said that the argument had travelled over various matters which in his opinion did not arise upon this rule, the sole ground of which was that the articles were calculated to prejudice the fair hearing of the appeal.

.        .        .        .        .

"The Court, continued his Lordship, is not a school of taste; however deplorable, however disgusting these articles may be, or be thought to be, the question of censure to be passed on

---

[1] The decision is commented upon in 207 L. T. 181 (1949) and 207 L. T. 225 (1949).

them by men of taste or men of discretion does not arise. The only question is whether they are calculated to prejudice the fair hearing of the appeal. In my opinion, whatever may be the remedies of Hobbs otherwise, or the views of a *censor morum* or tasteful critic about these articles, they do not come within this branch of the law of contempt, and the rule will be discharged."

2. *Rex* v. *Editor of the Daily Mail*, 44 T. L. R. 303 (K. B. 1928) (Lord Hewart C. J., Avory and Branson JJ.). Rule *nisi* for contempt of court with respect to an article in the *Daily Mail* commenting on a suit for libel [2] by one Factor against the newspaper based on an earlier article published therein. The article as to which contempt was charged contained material which had frequently appeared in prior issues of the paper, but did not touch on the issue of fact in the libel proceeding. The judgment of the court discharging the rule was delivered by the Lord Chief Justice and reported in part as follows:

"The Court was not satisfied that the article of December 23—coming as it did, after a long series of similar articles, being but a repetition of charges already often made against Factor and not complained of, and avoiding, as it did, any further mention of the alleged association of Factor with Montgomery—was calculated to prejudice the trial of the only issues which Factor had chosen to raise—namely, that of his association with Montgomery and of the damages which he should obtain if that issue were found in his favour [p. 307]."

3. *Rex* v. *Editor, Printers, and Publishers of News of the World*, 48 T. L. R. 234 (K. B. 1932) (Lord Hewart C. J., Avory and Hawke JJ.). Rule *nisi* for contempt of court for publishing prior to the trial what purported to be a statement of the defense which would be made. The judgment of the court discharging the rule was delivered by the Lord Chief Justice and reported in part as follows:

"No doubt in some circumstances, and in some cases, the publication beforehand of what was said to be the defence of an accused person might amount to contempt of Court. They were dealing, however, not with general principles, but with the question whether those words came within the mischief against

---

[2] This proceeding was civil, but it is included herein for completeness.

which contempt proceedings were directed. They now had it from counsel supporting the rule that last December something of the same sort had actually been said to the police by the accused man himself [pp. 234–35]."

4. *Rex* v. *Davies,* [1945] 1 K. B. 435 (Humphreys and Oliver JJ.). Application for an order for a writ of attachment for contempt of court, based on comments in a newspaper article about one convicted of procuring miscarriage, made after notice of appeal of the conviction had been filed. The motion was refused on the ground that the particular comments did not amount to a contempt of court, but both Humphreys and Oliver JJ. agreed that there might be contempt even though the trial had ended. Portions of their opinions follow:

"HUMPHREYS J. . . . Can the publication of any defamatory matter, or of any matter which would amount to a contempt of court if it had been published before the applicant in the present case had been tried by a jury, be said to be calculated to interfere with the due course of law and justice by prejudicing the fair hearing of the applicant's appeal? In considering this question one must remember what are the powers of the Court of Criminal Appeal. If that court existed for the sole purpose of deciding questions of law which come before it, the answer to the question I put above might well be in the negative. It might be said that it is inconceivable that any court considering a pure question of law could be affected by anything written in a newspaper about the character of one of the parties in a civil or criminal case. It is, indeed, inconceivable that if one of the judges of such a court had happened to have read the particular newspaper in question, it could have the smallest effect on him. Those observations, however, do not apply in the case of the Court of Criminal Appeal. That court has many functions to perform. One of the powers which it possesses, as was decided by the House of Lords in *Crane* v. *Director of Public Prosecutions* [(1921) 15 Cr. App. R. 183], is that when it finds that proceedings on an indictment are for any reason void, it may order a trial of the indictment in question. It, therefore, has the power which used to exist in the court for the consideration of Crown Cases Reserved, of awarding venire de novo. The effect of that is that in any case coming before it the Court of Criminal Appeal may direct that a jury shall

be sworn to try the issue on the indictment which has never properly been tried. It is, therefore, quite a fallacy to treat this case as if all that the Court of Criminal Appeal could do with regard to it would be to decide a question of law. It may be true in a sense that they are deciding a question of law, but the effect of their decision may be that a jury will have to try the question of fact. It follows that any matter which is published between the date of a conviction and the date of the hearing by the Court of Criminal Appeal may come to the attention of a juryman who has to try the question of the guilt or innocence of some person on the indictment in respect of which venire de novo has been awarded. . . . There is another matter regarding which I desire to say a few words. I think it is a fallacy to assume that the only object of imposing punishment for contempt of court in a criminal case is to prevent a juryman, who may be trying the person affected, from reading matter of which he ought to know nothing. There is also the judge to be considered, and, while I am not saying for a moment that any person sitting in a judicial capacity, who may, be it remembered, be a chairman of quarter sessions, who may or may not be a lawyer, or a recorder, or it may be, of course, one of the judges of the King's Bench Division, would be affected by anything he might read, I think it is a fallacy to say or to assume that the presiding judge is a person who cannot be affected by outside information. He is a human being, and while I do not suggest that it is likely that any judge, as the result of information which had been improperly conveyed to him, would give a decision which otherwise he would not have given, it is embarrassing to a judge that he should be informed of matters which he would much rather not hear and which make it much more difficult for him to do his duty. . . . It is my own opinion and I express it as such, but I venture to think that no judge with long criminal experience will fail to be able to recall instances in which the publication of matters such as that to which I have referred has had the effect of making the task of a judge extremely difficult, and no one has the right to publish matter which will have that effect [pp. 441–43]."

"OLIVER J. . . . One of the evils of inadmissible matter being disseminated is that no one can tell what effect a particular piece of information may have on his mind. Why, as my Lord has asked, and I can think of no better word, should a judge

be 'embarrassed' by having matters put into his mind, the effect of which it is impossible to estimate or assess? As an illustration of this proposition, the Court of Criminal Appeal has expressed, not once but many times, its thorough disapproval of evidence which is sometimes given by police officers at the end of a case when a man has been convicted. On such occasions all sorts of allegations are frequently made against a man's character, sometimes in the nature of hearsay and sometimes not supported by evidence at all. What is the ground for the disapproval of the Court of Criminal Appeal regarding such statements? It can only be that the judge who, after hearing the statements, has to pronounce sentence, may, quite unconsciously, have his judgment influenced by matters which he has no right to consider. . . . Not all defamatory matter can amount to contempt of court. It is unnecessary to go through the authorities, but that appears in case after case. Whether defamatory matter amounts to contempt in any particular case is a question in each case of fact, of degree and of circumstances. Obviously far less would amount to contempt of court if the matter were published before the hearing by a jury than would be required before a hearing by a judge or by the Court of Criminal Appeal. . . . Much is said to-day about the freedom of the press, and I only wish to point out that our decision in this case comes to no more than this: that everything the public has a right to know about a trial of the kind with which we are here concerned, that is to say, everything that has taken place in open court, may be published, and beyond that there is no need or right to go [pp. 445–46]."