No. 78–78. SINGLETON ET UX. *v.* COMMISSIONER OF INTERNAL REVENUE. C. A. 5th Cir. Certiorari denied. 

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE POWELL join, dissenting.

The issue in this federal income tax case is whether a cash distribution that petitioner husband (hereafter petitioner) received in 1965 with respect to his shares in Capital Southwest Corporation (CSW) was taxable to him as a dividend, as the United States Court of Appeals for the Fifth Circuit held, or whether that distribution was a return of capital and therefore not taxable, as the Tax Court held. I regard the issue as of sufficient importance in the administration of the income tax laws to justify review here, and I dissent from the Court's failure to grant certiorari.

CSW was the parent of a group of affiliated corporations. Consolidated returns were filed for CSW and the group for the fiscal years ended March 31, 1964 and 1965. This was advantageous taxwise, for it enabled income of Capital Wire & Cable Corporation (CW), one of the subsidiaries, to be offset against losses sustained by CSW. CW's board formally recognized a saving in tax of about $863,000 through the filing of consolidated returns for the two fiscal years. That board then distributed $1 million in March 1965, not solely to CSW, its principal shareholder, but ratably to all its shareholders. As primary shareholder, CSW received $803,750 of that distribution.

The Internal Revenue Service subsequently determined that the consolidated returns for fiscal 1964 and 1965 did not accurately reflect the earnings of the group. Asserted deficiencies were settled in 1972 for approximately $900,000. Of this amount, about $755,000 was allocated to CW.

Petitioner takes the position that CW's allocable share of the 1965 tax must be accrued to that fiscal year; that CW's 1965 payment to CSW was thus not a dividend entering into the determination of CSW's earnings and profits at all, but was a constructive payment of CW's share of the tax bill; that this left CSW with no earnings and profits for 1965; and that, as a consequence, CSW's 1965 distribution to petitioner could only be a nontaxable return of capital and could not be a taxable dividend. The Tax Court, in a reviewed decision, with six judges dissenting, accepted this view. 64 T. C. 320 (1975). The Fifth Circuit reversed. 569 F. 2d 863 (1978).

As is not infrequently the situation in tax cases, the parties initially wage a battle of maxims. Petitioner speaks of "substance and realities" and cites, among other cases, *Helvering* v. *Lazarus & Co.,* 308 U. S. 252, 255 (1939), and *Frank Lyon Co.* v. *United States,* 435 U. S. 561, 573 (1978). The Commissioner asserts that a taxpayer must accept the tax consequences of his structural choice and cites *Commissioner* v. *National Alfalfa Dehydrating & Milling Co.,* 417 U. S. 134, 149 (1974). In addition, however, it is clear that CW's distribution was definitely intended to compensate CSW for the tax saving effected by the beneficial use of CSW's loss in the consolidated return. On the other hand, that compensatory action was accomplished by a pro rata distribution not only to CSW but to minority shareholders as well.

For me, the answer to this tax question is by no means immediately apparent. Each side advances a forceful argument. The deep division among the judges of the Tax Court is indicative and significant. I cannot regard the issue as one that is too fact-specific or incapable of precedential effect. On the contrary, it features important aspects of tax accounting and tax law. CSW and CW, after all, were accrual-basis taxpayers. Normally, when a deficiency in tax of an accrual-basis taxpayer is ultimately determined, it is to be accrued as of the tax year of the deficiency and it affects earnings and

profits accordingly. A consideration opposing this accepted proposition is the fact that the portion of CW's 1965 distribution paid to minority shareholders obviously qualified and apparently was reported as taxable dividends; it would be at least somewhat anomalous to have the portion paid to CSW constitute, in contrast, a return of capital.

I hope that the Court's decision to pass this case by is not due to a natural reluctance to take on another complicated tax case that is devoid of glamour and emotion and that would be remindful of the recent struggles, upon argument and reargument, in *United States* v. *Foster Lumber Co.*, 429 U. S. 32 (1976), and *Laing* v. *United States*, 423 U. S. 161 (1976).*

Opinion of MR. JUSTICE STEVENS respecting the denial of the petition for writ of certiorari.

What is the significance of this Court's denial of certiorari? That question is asked again and again; it is a question that is likely to arise whenever a dissenting opinion argues that certiorari should have been granted. Almost 30 years ago Mr. Justice Frankfurter provided us with an answer to that question that should be read again and again.

> "This Court now declines to review the decision of the Maryland Court of Appeals. The sole significance of such denial of a petition for writ of certiorari need not be elucidated to those versed in the Court's procedures. It simply means that fewer than four members of the Court deemed it desirable to review a decision of the lower court as a matter 'of sound judicial discretion.' Rule 38, paragraph 5. A variety of considerations underlie denials of the writ, and as to the same petition different reasons may lead different Justices to the same result. This is especially true of petitions for review on writ of certiorari

---

*The point MR. JUSTICE STEVENS would make by his separate opinion was answered effectively 25 years ago by Mr. Justice Jackson, concurring in the result, in *Brown* v. *Allen*, 344 U. S. 443, 542–544 (1953).

to a State court. Narrowly technical reasons may lead to denials. Review may be sought too late; the judgment of the lower court may not be final; it may not be the judgment of a State court of last resort; the decision may be supportable as a matter of State law, not subject to review by this Court, even though the State court also passed on issues of federal law. A decision may satisfy all these technical requirements and yet may commend itself for review to fewer than four members of the Court. Pertinent considerations of judicial policy here come into play. A case may raise an important question but the record may be cloudy. It may be desirable to have different aspects of an issue further illumined by the lower courts. Wise adjudication has its own time for ripening.

"Since there are these conflicting and, to the uninformed, even confusing reasons for denying petitions for certiorari, it has been suggested from time to time that the Court indicate its reasons for denial. Practical considerations preclude. In order that the Court may be enabled to discharge its indispensable duties, Congress has placed the control of the Court's business, in effect, within the Court's discretion. During the last three terms the Court disposed of 260, 217, 224 cases, respectively, on their merits. For the same three terms the Court denied, respectively, 1,260, 1,105, 1,189 petitions calling for discretionary review. If the Court is to do its work it would not be feasible to give reasons, however brief, for refusing to take these cases. The time that would be required is prohibitive, apart from the fact as already indicated that different reasons not infrequently move different members of the Court in concluding that a particular case at a particular time makes review undesirable. It becomes relevant here to note that failure to record a dissent from a denial of a petition for writ of certiorari in nowise

implies that only the member of the Court who notes his dissent thought the petition should be granted.

"Inasmuch, therefore, as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated." Opinion respecting the denial of the petition for writ of certiorari in *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912, 917–919.

When those words were written, Mr. Justice Frankfurter and his colleagues were too busy to spend their scarce time writing dissents from denials of certiorari. Such opinions were almost nonexistent.[1] It was then obvious that if there was no need to explain the Court's action in denying the writ, there was even less reason for individual expressions of opinion about why certiorari should have been granted in particular cases.

Times have changed. Although the workload of the Court has dramatically increased since Mr. Justice Frankfurter's day,[2] most present Members of the Court frequently file written dissents from certiorari denials. It is appropriate to ask whether the new practice serves any important goals or contributes to the strength of the institution.

One characteristic of all opinions dissenting from the denial of certiorari is manifest. They are totally unnecessary. They

---

[1] There were none in 1945 or 1946, and I have been able to find only one in the 1947 Term. See dissent in *Chase National Bank* v. *Cheston,* and companion cases, 332 U. S. 793, 800.

[2] By way of comparison to the figures cited by Mr. Justice Frankfurter, the Court during the three most recent Terms reviewed and decided 362, 483, and 323 cases respectively. And during each of these Terms, the Court denied certiorari in well over 3,000 cases.

are examples of the purest form of dicta, since they have even less legal significance than the orders of the entire Court which, as Mr. Justice Frankfurter reiterated again and again, have no precedential significance at all.

Another attribute of these opinions is that they are potentially misleading. Since the Court provides no explanation of the reasons for denying certiorari, the dissenter's arguments in favor of a grant are not answered and therefore typically appear to be more persuasive than most other opinions. Moreover, since they often omit any reference to valid reasons for denying certiorari, they tend to imply that the Court has been unfaithful to its responsibilities or has implicitly reached a decision on the merits when, in fact, there is no basis for such an inference.

In this case, for example, the dissenting opinion suggests that the Court may have refused to grant certiorari because the case is "devoid of glamour and emotion." I am puzzled by this suggestion because I have never witnessed any indication that any of my colleagues has ever considered "glamour and emotion" as a relevant consideration in the exercise of his discretion or in his analysis of the law. With respect to the Court's action in this case, the absence of any conflict among the Circuits is plainly a sufficient reason for denying certiorari. Moreover, in allocating the Court's scarce resources, I consider it entirely appropriate to disfavor complicated cases which turn largely on unique facts. A series of decisions by the courts of appeals may well provide more meaningful guidance to the bar than an isolated or premature opinion of this Court. As Mr. Justice Frankfurter reminded us, "wise adjudication has its own time for ripening."

Admittedly these dissenting opinions may have some beneficial effects. Occasionally a written statement of reasons for granting certiorari is more persuasive than the Justice's oral contribution to the Conference. For that reason the written document sometimes persuades other Justices to change their

votes and a petition is granted that would otherwise have been denied. That effect, however, merely justifies the writing and circulating of these memoranda within the Court; it does not explain why a dissent which has not accomplished its primary mission should be published.

It can be argued that publishing these dissents enhances the public's understanding of the work of the Court. But because they are so seldom answered, these opinions may also give rise to misunderstanding or incorrect impressions about how the Court actually works. Moreover, the selected bits of information which they reveal tend to compromise the otherwise secret deliberations in our Conferences. There are those who believe that these Conferences should be conducted entirely in public or, at the very least, that the votes on all Conference matters should be publicly recorded. The traditional view, which I happen to share, is that confidentiality makes a valuable contribution to the full and frank exchange of views during the decisional process; such confidentiality is especially valuable in the exercise of the kind of discretion that must be employed in processing the thousands of certiorari petitions that are reviewed each year. In my judgment, the importance of preserving the tradition of confidentiality outweighs the minimal educational value of these opinions.

In all events, these are the reasons why I have thus far resisted the temptation to publish opinions dissenting from denials of certiorari.