OPINION OF THE COURT
F. Dana Winslow, J.
At the pretrial conference held on March 24, 2000, the court received an application from News 12 Long Island for an order seeking permission to conduct gavel-to-gavel audio/visual coverage of the trial of this matter scheduled to commence March 28, 2000.
The plaintiffs consented to this application without reservation or limitation. The interveners, the United States Government as well as the Attorney General of the State of New York, also consented without reservation or limitation.
Defense counsel requested an opportunity of several hours to discuss this issue with their clients. Thereafter, at 3:00 p.m. on March 24, 2000 the court received a letter from defense counsel stating “counsel will not have an opportunity to discuss this [matter] with all representatives of Nassau County before March 28th, but defendants reserve their right to object to cameras being permitted full and uninhibited access to the courtroom while this matter is being tried.”
The court finds that even though the defendants have not objected, it will treat their response as an objection for the purposes of considering News 12’s application.
The question presented is: Does section 52 of the Civil Rights Law require this court to deny the News 12 application? This issue must be considered in the context of the 1997 sunset or conclusion of the “Cameras in the Court” experiment which authorized the televising of court proceedings as an abrogation or exception to section 52 pursuant to Judiciary Law § 218. Section 52 provides, in pertinent part: “No person * * * shall televise * * * [a] proceeding!], in which the testimony of witnesses by subpoena * * * is or may be taken * * * conducted by a court, commission, committee, administrative agency or other tribunal in this state.”
*240 The issue of cameras in the court is not unique. It was previously presented to Justice Joseph C. Teresi in People v Boss (182 Misc 2d 700). This court finds Justice Teresi’s analysis convincing and its application in this reassessment case compelling. However, the distinction, i.e., a civil rather than a criminal proceeding, makes the determination of the unconstitutionality of section 52 of the Civil Rights Law all the more apparent.
Although Justice Teresi maintains that “[t]his is a per se ban on all audio-visual coverage of trial court proceedings, under all circumstances in any case” (People v Boss, supra, at 702), this court disagrees. The ban prohibits televising proceedings in which witnesses may be compelled to testify. If a trial or other proceeding did not contemplate the introduction of compelled testimony, there would not then be a section 52 ban. However, no provision is made for consent of those who testify by compulsion. On that basis alone, section 52 of the Civil Rights Law is unconstitutional as being arbitrary and capricious by denying free speech in violation of the First Amendment to the United States Constitution and article I, § 8 of the New York State Constitution.
A witness who appears voluntarily does so with the recognition that there may be an audience containing friendly, unfriendly and unknown faces. All segments of the media may be present, as of right, and the distinguishing feature amongst the media representatives is the nature and extent of their respective interpretations. There may be little or great differences between the interpretation of a print journalist and the observation of the actual event; but the public will never know without the opportunity to perceive both. The second concern has been substantially reduced by technological developments. The massive equipment and lighting requirements of the 1950’s and 1960’s have been replaced in the year 2000 with unobtrusive stationary cameras utilizing natural light. The court does not have to address the issue of the effect that cameras in the court might have on a jury as this case is being tried without a jury.
The First Amendment has been interpreted to require that court proceedings be public, inclusive of the press. It is in reality “public property” (Craig v Harney, 331 US 367, 374). Justice Felix Frankfurter in 1950 said, “[o]ne of the demands of a democratic society is that the public should know what goes on in courts” (Maryland v Baltimore Radio Show, 338 US 912, 920 [1950]). In light of this mandate, how should section 52 be viewed?
*241 An historical examination of section 52 of the Civil Rights Law demonstrates that it was initially adopted in 1952 as chapter 241 of the Laws of 1952, the year of the untelevised Eisenhower/Stevenson election debates, and eight years before the first Andy Griffith Show, clearly at television’s dawn. Chapter 241 of the Laws of 1952 was amended twice, first by chapter 706 of the Laws of 1962. The chapter 706 amendment was confined to carving out an exception to the broadcast prohibition for legislative hearings. However, a requirement imposed on the Legislature was to find “that it is in the public interest to permit the televising, broadcasting or taking of motion pictures.” (Civil Rights Law § 52.) No such concern is expressed in chapter 241. An examination of the present section 52 reveals that the only modification from either chapter 706 or chapter 241 is the inclusion of the Legislature and the Public Service Commission as exceptions to the broadcast ban.
This court determines that the initial adoption of section 52 is unconstitutional, and that with each successive amendment the arbitrary and capricious nature of the legislative act becomes more apparent. In addition, no safeguards were included to ameliorate the effect of denying coverage to a segment of the press in the face of consent by those required to participate in the proceeding, a violation of the Equal Protection Clause of the Fourteenth Amendment.
The court additionally determines that section 52 has no application in the instant civil claim because the mere possibility of compulsory appearance is insufficient to withhold the broadcast. A determination must be made whether the issuance of a judicial subpoena by this court will be withdrawn by its applicant — intervenor New York State Attorney General — or struck by this court. The word “may,” when addressing compulsory process, is itself sufficiently indefinite as to be arbitrary and capricious.
The public need for the telecast of the reassessment proceedings is clear. As many as 1.3 million people, including 415,000 homeowners, may be directly or indirectly affected by the outcome of this trial. Even more importantly, the perception of fairness at this, Nassau County’s most perilous fiscal time, is paramount to achieving financial success. Confining the courtroom to its seating capacity will not foster this need.
The court grants News 12 Long Island’s motion and will allow audio/video coverage which shall begin with opening statements and follow the established restriction on coverage (see, 22 NYCRR 131.7, 131.8). News 12 Long Island will provide the *242 only audio/video camera allowed in the courtroom, and it will serve as the sole pool camera for the broadcast media and will provide access to all interested media representatives through the audio/visual feed from that pool camera.