DA 10-0349

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 217

MUSSELSHELL RANCH COMPANY, a Montana
corporation; MARY T. COOLEY, DANIEL COOLEY,
BRIAN COOLEY, DARREN COOLEY, CALLIE RECH,
d/b/a COOLEY RANCH,

Plaintiffs and Appellants,

v.

NATALIYA SEIDEL-JOUKOVA, a/k/a
NATALIYA SEIDEL JOUKOVA, and
JOHN DOES 1-5,

Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Fourteenth Judicial District,<br>In and For the County of Musselshell, Cause No. DV 09-43<br>Honorable Randal I. Spaulding, Presiding Judge |

COUNSEL OF RECORD:

For Appellants:

John R. Christensen, Ben T. Sather; Christensen Fulton & Filz, PLLC;
Billings, Montana

For Appellee:

Nataliya Seidel-Joukova, (self-represented litigant); Musselshell, Montana

Submitted on Briefs: May 18, 2011

Decided: August 31, 2011

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Plaintiffs Musselshell Ranch Company and Cooley Ranch appeal the order of the Fourteenth Judicial District Court, Musselshell County, allowing a culvert and rock bridge placed in their irrigation ditch (the "Cooley-Goffena" ditch) by Defendants ("Joukova") to remain in the ditch. The District Court concluded the structure did not unreasonably interfere with plaintiffs' easement rights in the ditch. We reverse. We consider the following issue on appeal:

¶2 *Whether the District Court erred in allowing Joukova's culvert and rock bridge to remain in the Cooley-Goffena irrigation ditch.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The Cooley-Goffena irrigation ditch has been diverting water from the Musselshell River for over a century. The original owners, George Handel and John Cooley, claimed water rights through use of the ditch in 1891 and 1892. At some point prior to 1949, Handel's interest was acquired by the Goffena family, the owners of the Musselshell Ranch Company, resulting in the split ownership of the ditch between the Cooleys and the Goffenas which continues to the present day. The ditch diverts the Musselshell to the north of the river, then continues in a generally easterly direction to its various places of use on plaintiffs' lands. The Goffenas rely on the water from the ditch to irrigate over 300 hay ground acres, which serve a 30,000 acre cattle operation. They own the rights to approximately four-fifths of the water in the ditch when it is in operation from April to October. The Cooleys also use the ditch to irrigate hay fields for their cattle operation, and own the vast majority of the remainder of the water rights. For

2

purposes of convenience, the Cooleys and Goffenas are hereinafter referred to collectively as "MRC."

¶4 At various times throughout its history, the location of the ditch has been altered to accommodate the needs of large construction projects, notably the construction of the Chicago, Milwaukee, St. Paul & Pacific Railroad in about 1907 and a 2002 road-widening project on U.S. Highway 12. The latter project had a substantial impact on Edwin and Jean Bohlman's property (now Joukova's) and the Cooley-Goffena ditch running through it. In April 2002, as part of the road-widening project, the State obtained an easement from the Bohlmans to relocate the ditch to its present location on Joukova's property and arranged for the easement to be recorded in favor of MRC. The recorded easement does not encompass the entire ditch. The ditch travels across Joukova's property for about a half-mile, but the recorded easement covers under 200 yards of that length. The easement rights on the remainder of the ditch, including the portion in which the culvert and rock bridge at issue are located, are claimed through historical use and as incidents of ownership of the ditch and water rights. There is no question as to the validity or existence of either the primary ditch easement or secondary easement for ditch maintenance.

¶5 As a result of the relocation, some of the Bohlmans' land previously made inaccessible by the ditch became dry and useable. An access gate was installed by the State, enabling access to the Bohlmans' property from Highway 12 for the first time. In 2006, the Bohlmans subdivided their land and sold the property in question to Joukova. The access gate installed in 2002 provided the only route from Highway 12 to the parcel,

3

with the only other legal access through the Bohlmans' retained land to the north. Shortly after she purchased the property, Joukova graveled the road over opposition from the ditch users, who claimed the access gate was not intended to provide access to Joukova's property, but rather to the ditch for maintenance purposes alone. Joukova proceeded with construction over MRC's objections after obtaining a permit from the State to construct an approach from the highway.

¶6 The dispute between the parties flared up again on June 2, 2009, when plaintiffs were performing ditch maintenance on Joukova's property and encountered the newly-installed culvert and bridge. Joukova had placed a culvert in the ditch bottom, and had completely filled in the ditch surrounding the culvert on either side with rock and gravel. She then added several additional feet of rock and gravel above the culvert, up to the height of the ditch bank, to create a sturdy rock bridge across the ditch. Plaintiffs' maintenance crew was forced to exit the ditch with the bulldozer to go around the bridge. When the crew had finished cleaning out the ditch, they dismantled the east end access gate to exit the property, as Joukova had not unlocked the gate to allow the maintenance crew to continue along the ditch from west to east. Communication between the parties was difficult as Joukova has no phone installed at her property. A confrontation ensued when Joukova and her husband came upon the maintenance crew dismantling the gate. The parties engaged in a spirited discussion of their respective property rights, after which Jeff Goffena departed in such haste that his truck's wheels spun gravel at Joukova and her husband, breaking Joukova's glasses.

4

¶7     The following day, Joukova penned a letter seeking redress for her glasses and demanding that the Goffenas stop questioning her property rights. She sent a copy of the letter to Bud Goffena, as well as to Mary Cooley and the Musselshell County Sheriff's Department. MRC responded through counsel and litigation began soon thereafter. Joukova sought to protect her culvert, bridge and access from the highway. MRC sought to prohibit Joukova from accessing her property from Highway 12 via the improved road along the ditch bank, and sought removal of the bridge and culvert. MRC also sought access to Joukova's locked east-end gate and reinstallation of the west-end gate removed by Joukova.

¶8     The District Court found credible Joukova's testimony that she informed plaintiffs of her intention to install the culvert, although plaintiffs ardently disputed this point. The parties did *not* dispute, however, that Joukova did not receive permission for the installation, either in writing or orally. At most, Joukova argued that she received tacit permission because MRC raised no objections after allegedly being informed. She installed the culvert to the west of the pipeline to access the sliver of her property between the ditch and the highway, which amounts to an acre or so of useable land that she attests is a desirable location to water her horses. Joukova's culvert is 48 inches wide, slightly larger than the 40-to-47.5-inch cement pipeline installed by the state as part of the road construction.

¶9     The District Court upheld Joukova's rights to continue using the Highway 12 access and the improved road along the ditch bank, concluding that this use was not inconsistent with MRC's secondary easement rights. The court further concluded that the

5

culvert and bridge installed in 2009 could remain in place, as they did not "unreasonably interfere" with plaintiffs' secondary easement rights, "particularly considering that [Joukova] is unable to meaningfully utilize her property lying south of the ditch otherwise and considering that the Plaintiffs have allowed or permitted similar culverts in the past." The court concluded, however, that Joukova was interfering with MRC's secondary easement rights in other respects, and ordered Joukova to provide the ditch users with access through the locked gate on the east end of the property and to reinstall the removed gate on the west end. The court therefore declined to award either party attorney's fees and costs pursuant to § 70-17-112(5), MCA, as neither party "prevailed" within the meaning of the statute. MRC does not challenge on appeal the District Court's denial of fees.

¶10 MRC states in its brief that the other issues decided by the District Court are no longer relevant because Joukova has complied with court orders regarding the two gates and no longer uses the road adjacent to the ditch bank; Joukova disputes this latter point, but in any case these issues were not appealed. MRC appeals only the District Court's ruling that Joukova's culvert does not interfere with or encroach upon its secondary easement rights.

**STANDARD OF REVIEW**

¶11 We review a district court's findings of fact to determine whether they are clearly erroneous. *Stevens v. Novartis Pharms. Corp.*, 2010 MT 282, ¶ 24, 358 Mont. 474, 247 P.3d 244. We review a district court's conclusions of law, including its interpretation of

6

statutes, to determine whether those conclusions are correct. *Gibson v. Paramount Homes, LLC*, 2011 MT 112, ¶ 10, 360 Mont. 421, 253 P.3d 903; *Stevens*, ¶ 24.

## DISCUSSION

¶12 ***Whether the District Court erred in allowing Joukova's culvert and rock bridge to remain in the Cooley-Goffena irrigation ditch.***

*1. Legal Framework.*

¶13 In 1981, the Montana Legislature codified the common law principle, commonly known as a "secondary easement," that an owner of a ditch easement has the right to enter on the servient tenement to maintain the ditch. Section 70-17-112, MCA. Committee members suggested the bill would express "in very specific terms what the case law already provides" and, even in the absence of the law, "anyone with a ditch easement does have a secondary easement and the right to maintain that easement." Mont. H. Water Comm., *H. Bill 596 Executive Session*, 47th Legis., Reg. Sess. 2 (Feb. 12, 1981); *Hearing on H. Bill 596*, Reg. Sess. at 1. Testimony supporting the bill addressed the perceived danger from urban sprawl to ditch easements, made worse by the fact that very few ditch rights are on deeded rights-of-way and real estate developers and new landowners are often unaware of their existence, location, or scope. The statute thus served the twin purposes of codifying secondary easement rights and, more importantly, of increasing the availability of legal remedies by allowing an award of attorney's fees and costs to the prevailing party. The statute provides in pertinent part:

> **70-17-112. Interference with canal or ditch easements prohibited.** (1) A person with a canal or ditch easement has a secondary easement to enter, inspect, repair, and maintain a canal or ditch.

7

(2) No person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation or any other lawful domestic or commercial purpose, including carrying return water.

(3) The provisions of subsection (2) do not apply if the holder of the canal or ditch easement consents in writing to the encroachment or impairment.

. . . (5) If a legal action is brought to enforce the provisions of this section, the prevailing party is entitled to costs and reasonable attorney's fees.

As the drafters recognized, secondary easement rights were well-established in the common law and in Montana independent of § 70-17-112, MCA. "The right to enter upon the servient tenement for the purpose of repairing or renewing an artificial structure, constituting an easement, is called a 'secondary easement,' a mere incident of the easement . . . ." *Laden v. Atkeson*, 112 Mont. 302, 305-06, 116 P.2d 881, 883 (1941) (citing treatises).

¶14 In construing the requirements of § 70-17-112, MCA, we consider our discussion and application of its provisions over the statute's thirty-year history. "We presume that the legislature is aware of the existing law, including our decisions interpreting individual statutes . . . . We presume that if the legislature disagreed with our interpretation . . . it would have amended the statute accordingly." *Swanson v. Hartford Ins. Co.*, 2002 MT 81, ¶ 22, 309 Mont. 269, 46 P.2d 584 (internal citation and quotation marks omitted). *See also* Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* vol. 2B, § 49:5, 32-34 (7th ed., Thomson-Reuters/West 2008) ("Judicial construction of a statute becomes part of the legislation from the time of its enactment."). Cases decided by this Court after enactment of the statute illustrate that the common law governs determination of the location and scope of the secondary easement.

8

¶15 We made clear in *Engel v. Gampp*, 2000 MT 17, ¶ 43, 298 Mont. 116, 993 P.2d 701, for example, that the seminal 1941 case *Laden v. Atkeson* still "sets forth the rules governing secondary ditch easements in Montana." Thus, we explained, the statute does not define "*where, how, when* and *why*" the dominant owner may rightfully enter to inspect, repair and maintain the ditch "without unreasonably burdening the servient owner," or accordingly "whether an encroachment or impairment [of that right] occurred." *Engel*, ¶ 10 (emphasis in original). We cited *Gabriel v. Wood*, 261 Mont. 170, 176-77, 862 P.2d 42, 45-46 (1993), as authority for our observation that any obstruction of an easement must not " 'interfere with *reasonable* use of the right-of-way.' " *Engel*, ¶ 50 (emphasis added). *See also Mason v. Garrison*, 2000 MT 78, ¶¶ 47-49, 299 Mont. 142, 998 P.2d 531 (fences and garden beds "materially" and "unreasonably" interfered with dominant owners' easement rights to access and recreate on lakefront). Since a secondary easement is "a mere incident of the easement" (*Laden*, 112 Mont. at 305-06, 116 P.2d at 883), we apply the same analysis whether the case concerns primary or secondary easement rights. *See Engel*, ¶¶ 9-10; *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 47, 352 Mont. 212, 215 P.3d 675.

2. *Nature of MRC's Easement.*

¶16 Joukova does not challenge the validity of MRC's easement. As noted in the statement of facts above, a small portion of MRC's easement through Joukova's property was recorded in conjunction with the widening of Highway 12; the culvert and bridge, however, are not located in the part of the ditch covered by this recorded easement. MRC's rights at issue here, concerning the portion of the ditch that includes the culvert

9

and bridge, are claimed through prescriptive use and as attendant rights to the water right. While MRC's rights are statutorily *recognized* in § 70-17-112, MCA, ("[e]ach canal or ditch easement obtained by prescription . . . is included within the scope of this section") they are not *created* by statute, as the statute itself makes clear in subsection (4): "[n]othing in this section establishes a secondary easement where none existed prior to April 14, 1981."

¶17 Prescriptive easements generally restrict the dominant owner to whatever was in place historically, since the right "is governed by the character and extent of the use during" the prescriptive period. *Clark v. Heirs & Devisees of Dwyer*, 2007 MT 237, ¶ 26, 339 Mont. 197, 170 P.3d 927 (citations omitted); Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 8.12 (Thomson Reuters 2011); § 70-17-106, MCA. MRC's easement rights thus include both the right to flow a certain amount of water during a prescribed period and, secondarily, the right to maintain the system designed to flow that water as it historically has done.

¶18 MRC's rights in Joukova's land must be balanced with Joukova's own rights as the owner of the fee. In *Mattson*, we described as "longstanding and well-settled" the principle that "secondary easement rights must be exercised 'in such a reasonable manner as not to needlessly increase the burden upon' or do 'unnecessary injury to' the servient estate." *Mattson*, ¶ 47 (citing *Restatement (Third) of Property: Servitudes* § 4.10 (2000); *Laden*, 112 Mont. at 306, 116 P.2d at 884; *Engel*, ¶ 43). Joukova, in turn, may "make use of the land in any lawful manner that [she] chooses, which use is not inconsistent with and does not interfere with the use and right reserved to the dominant tenement or estate."

*Flynn v. Siren*, 219 Mont. 359, 361, 711 P.2d 1371, 1372 (1986) (quoting *City of Missoula v. Mix*, 123 Mont. 365, 372, 214 P.2d 212, 216 (1950)). Historical uses made of the servient tenement during the prescriptive period also bear upon Joukova's rights in the servient estate. Bruce & Ely, *The Law of Easements and Licenses in Land* at §§ 8.24, 8.27; 25 Am. Jur. 2d *Easements and Licenses* § 84 (2004) ("[w]hen the character of an easement is once fixed, no material alterations ordinarily can be made by either the servient owner or the easement owner without the other's consent.").

   *3. Analysis.*

¶19    The balancing of rights suggested by these general rules incorporates a standard of reasonableness: whether the servient owner's use *unreasonably* interferes with the easement rights. *Gabriel*, 261 Mont. at 178, 862 P.2d at 47. *See* Bruce & Ely, *The Law of Easements and Licenses in Land* at § 8.21 ("[a]lthough the servient owner is entitled to use the servient land, the owner may not *unreasonably* interfere with the easement holder's enjoyment of the servitude.") (emphasis added). If interference is "slight and immaterial . . . it is not objectionable." 25 Am. Jur. 2d *Easements and Licenses* § 84 (2004). *See also* Gerald Korngold, *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes* § 4.06(a) (2d ed., Juris Publg. 2004). Equally clear is that whether interference is reasonable depends on the factual circumstances of each particular case. *Gabriel*, 261 Mont. at 176-78, 862 P.2d at 45-48; *Engel*, ¶ 11; Bruce & Ely, *The Law of Easements and Licenses in Land* at § 8.21 ("[w]hether a particular activity by the servient owner constitutes an unreasonable interference is a question of fact, and uniform rules are difficult to formulate.") (citations omitted).

¶20 We have recognized that "[w]hat may be considered reasonable is determined in light of the situation of the property and the surrounding circumstances." *Gabriel*, 261 Mont. at 176, 862 P.2d at 46. For example, the servient owner's actions cannot make the easement more "inconvenient, costly, or hazardous to use." Korngold, *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes* at § 4.06(a); *e.g. Hatfield v. Ark. Western Gas Co.*, 632 S.W.2d 238, 241 (Ark. App. 1982) ("[t]he owner of the servient estate can do nothing tending to diminish its use or make it more inconvenient or create hazardous conditions"); *Beiser v. Hensic*, 655 S.W.2d 660, 663 (Mo. App. E. D. 1983). In *Flynn v. Siren*, we concluded that the placement of a chained gate across an easement unreasonably interfered with the dominant owners' easement rights. *Flynn*, 219 Mont. 359, 711 P.2d 1371 (1986). We found dispositive evidence "establish[ing] that the placing of the gate on the easement created a traffic hazard; that the gate, as installed, was too small to allow the passage of some farm machinery; and that the gate would have reduced [business traffic]." We concluded that the dominant owners were "entitled to an ungated, unbarricaded, unchained, free and unobstructed use of the right-of-way." *Id.* at 362, 711 P.2d at 1373.

¶21 We also dealt with the placement of a gate in *Stamm v. Kehrer*, 222 Mont. 167, 720 P.2d 1194 (1986). We concluded in *Stamm* that the construction of a fence and installation of a gate—despite the gate never having been locked, and rarely having been closed—impermissibly interfered with the dominant owner's easement rights. The new fence and gate, while preserving access to the dominant owner's garage, cut off her historically-used access from the alley to her lawn. We noted that the dominant owner

12

was an elderly woman, who "testified that the gates were very difficult for her to maneuver." *Id.* at 171, 720 P.2d at 1196. Similarly, in *Strahan v. Bush*, 237 Mont. 265, 773 P.2d 718 (1989), we held a gate unreasonably interfered with the dominant owners' use, as one owner (a year-round resident) could not "open the gate without assistance, and is therefore restricted in her movement from the property." *Id.* at 269, 773 P.2d at 721. The gate also interfered with snow removal and road maintenance, and plainly inconvenienced the dominant owners.

¶22 In contrast, when a gate does not make use of the easement more inconvenient, costly, or hazardous for the dominant owner, no unreasonable interference will be found. It is generally held that "the owner of the servient estate may erect gates across the way if they are constructed so as not to interfere unreasonably with the right of passage." 25 Am. Jur. 2d *Easements and Licenses* § 88 (2004). This was our conclusion in *Gabriel*. We noted that the dominant owners did not "use the easement to any significant extent" and observed that the district court had set forth "standards regarding Wood's gates in order to ensure the [dominant owners'] reasonable access." *Gabriel*, 261 Mont. at 177, 862 P.2d at 46-47. Likewise, other uses not affecting the dominant owner's use of an easement will not trigger a finding of unreasonable interference. In *Boylan v. Van Dyke*, 247 Mont. 259, 263-65, 806 P.2d 1024, 1026-27 (1991), we upheld a finding that the servient owner's construction of a pond did not interfere with the dominant owner's ditch easement, even though a dam had been placed across the ditch. Our decision was based on the district court's determination that the pond did not interfere with the flow of water through the ditch and had actually facilitated maintenance of the ditch. *See also Titeca v.*

13

*State*, 194 Mont. 209, 634 P.2d 1156 (1981) (use of road by public did not interfere with dominant owner's use of road).

¶23 Forcing the dominant owner to defend an easement right in court also may constitute unreasonable interference with the right. *Kephart v. Portmann*, 259 Mont. 232, 239, 855 P.2d 120, 124 (1993); *Byrum v. Andren*, 2007 MT 107, ¶¶ 47-50, 337 Mont. 167, 159 P.3d 1062. That claim has not been raised by MRC which, as noted, challenges on appeal only the installation of the culvert and bridge.

¶24 The ditch owners in the present case testified to the inconvenient and hazardous new route that Joukova's culvert forced them to take when performing maintenance on the ditch. Unlike other culverts installed with MRC's permission, Joukova's culvert is located in an uneven area with heavy growth, making entry and exit from the ditch with heavy equipment difficult. The District Court found that the culvert and bridge did not "obstruct or impede the flow of water" in the ditch—and thus did not impair MRC's primary easement right. The court also found that having to exit and re-enter the ditch "minimally hindered" and was not "a major imposition" on MRC's maintenance activities. The court's conclusion that no unreasonable interference was present failed to take into account the statute's express prohibition against encroachment, in light of the law's historical view that permanently obstructing a right of passage is not permitted. Case law makes clear that such a permanent and immovable encroachment constitutes unreasonable interference with the easement right.

¶25 Our gate cases help illustrate this point. Where the obstruction was immovable, such as a chained and locked gate (*Flynn*) or fixed fence (*Stamm*), we have concluded

14

that unreasonable interference was present. In contrast, when the obstruction was removable—the gate could be opened and traffic could proceed as normal—we have concluded that the interference was no more than necessary to achieve a reasonable balance of the parties' property rights. *Gabriel*, ¶¶ 42, 45-46; *Engel*, ¶¶ 50, 55.

¶26 "The prevailing view is that the owner of a servient estate may not erect any structures that encroach on a right-of-way." Bruce & Ely, *The Law of Easements and Licenses in Land* at § 8.22 (citing cases). Servient owners "cannot pursue a development plan that encroaches upon a right-of-way even if the dominant owner still has an unobstructed passageway." *Id.* at § 8.22 (citing *Louis W. Epstein Fam. Partn. v. Kmart Corp.*, 13 F.3d 762, 766-69 (3d Cir. 1994)). "If the improvement is temporary and easily removed, it is generally not unreasonable. The more expensive the improvement or the more difficult its removal is likely to be, the more likely is the conclusion that the improvement is an unreasonable interference with the easement . . . ." *Restatement (Third) of Property: Servitudes* § 4.9 (2000).

¶27 Some permanent encroachments may not justify a finding of unreasonable interference. The particular facts of a situation are always controlling, and what is reasonable or unreasonable is often a close call. We permitted the dam in *Boylan* because it did not impede the flow of water *or* increase the maintenance of the ditch. *Boylan*, 247 Mont. at 264, 806 P.2d at 1027. *See also Marsh v. Pullen*, 623 P.2d 1078 (Or. App. 1981) (suggesting that the installation of eight-to-ten-inch speed bumps constituted an unreasonable interference, and concluding that seven-inch speed bumps did not). On the facts present here, we conclude Joukova's rock bridge and culvert constitutes an

15

unreasonable interference with MRC's secondary easement rights. MRC's reasonable secondary easement rights to enter the ditch for repair and maintenance have been impaired and encroached upon.

¶28 Furthermore, the public policy espoused in § 70-17-112, MCA, does not countenance the installation of culverts such as Joukova's absent written permission from the easement holder. Tacit permission is insufficient. *Glenn v. Grosfield*, 274 Mont. 192, 196, 906 P.2d 201, 204 (1995). As one court put it when confronted with a servient owner's filling of land subject to the United States' flowage easement:

> [T]he Government does not have the burden of showing the impact of the fill material placed on the easement by [the servient owner] on the operation of the flowage easement and the impoundment of flood water in the Grapevine Reservoir. If every land owner whose property is encumbered by a flowage easement acquired by the Government for the [reservoir] placed fill material in the easement, it is obvious that the Government's ability to impound flood water would be seriously impaired.

*U.S. v. Austin Two Tracts, L.P.*, 239 F. Supp. 2d 640, 643 (E.D. Tex. 2002).

¶29 Analogizing to the present case, if every landowner whose property is encumbered by a ditch easement placed culverts in the ditch, it is obvious the ditch owners' ability to exercise their secondary easement rights to maintain the ditch would be seriously impaired. Though Joukova complains that having to exit and re-enter the ditch at one point along the maintenance route is not a material inconvenience, we cannot condone Joukova's unilateral installation of the culvert and rock bridge simply because other landowners along the ditch have not followed suit.

¶30 We therefore cannot agree with the District Court that the placement of the permanent, irremovable culvert and rock bridge did not interfere with or encroach on

16

MRC's secondary easement rights. Joukova has erected a structure that prevents normal, historic use of that portion of the secondary easement, thereby violating § 70-17-112, MCA. MRC is entitled to removal of the culvert and bridge. Joukova cannot be deprived of her rights to use her land currently accessed via the rock bridge, but she is required to make use of this land in a manner that does not impair the rights held in the land by MRC. Joukova may seek other alternatives for access to this portion of her property, short of erecting a permanent structure in the ditch bed. Accordingly, we reverse the District Court and remand for entry of an order directing removal of the culvert and bridge.

¶31 While the Dissent agrees the culvert and bridge must be removed, it "strenuously" objects to the proposition that the law obliges dominant and servient owners to be reasonable with one another. As we stated in *Mattson*, however, "[r]ights must be exercised with reference to the rights of others." *Mattson*, ¶ 47. A dominant owner's secondary easement rights are "confined by the responsibility of not unreasonably burdening the servient owner." *Engel*, ¶ 50. It is easy in the abstract to think that interpreting the statute—for the first time—to create an absolute bar to *any* disturbance in a ditch, no matter how slight, will diminish conflicts between landowners and relieve the courts from easement disputes. But had the Dissent's hard-and-fast rule been applied in *Byrum*, for example, we would have been compelled to reverse, rather than affirm, the district court's ruling that the servient owners had not physically interfered with the dominant owners' ditch easement by "occasionally block[ing]" the dominant owners from using the headgates on the ditch, though they eventually allowed access. *Byrum*,

17

¶ 46. Our ruling today upholds MRC's secondary easement to maintain its ditch as is reasonable and as it historically has done. Section 70-17-106, MCA. This ruling applies the letter of the law in harmony with the well-settled principles that have guided this Court's interpretation of easement disputes for decades.

**CONCLUSION**

¶32    We cannot agree with the District Court's conclusion that the installation of the culvert and rock bridge did not interfere with MRC's secondary easement rights. Joukova's construction of a structure permanently blocking use of a portion of MRC's secondary easement inarguably encroaches on the easement. As set out above, the law governing easements makes clear that construction of the culvert constituted an unreasonable interference with MRC's easement rights, for which the statute required Joukova to obtain written permission.

¶33    Reversed and remanded for further proceedings in accordance with this opinion.


                                            /S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS


Justice Jim Rice, concurring.

¶34    I agree with much of the legal analysis in Justice Nelson's dissenting opinion and believe we must be careful about applying general, common law easement concepts or public policy

18

where the Legislature has enacted a specific statute governing the ditch easement dispute at issue. Otherwise, the statute could lose its distinctive quality. However, I believe the Court has reached the correct outcome and thus concur in the decision.

¶35 The District Court found the installation of the culvert and rock bridge had hindered Plaintiffs' ability to maintain their ditch and, although the court deemed the hindrance to be minimal, it is clear to me that Defendants' actions "encroach[ed] upon or otherwise impair[ed]" Plaintiffs' secondary easement rights. Section 70-17-112(2), MCA. While some uses of the servient estate may result in negligible impacts upon dominant ditch easement rights, the impacts here were significant enough to constitute a violation of the statute.

/S/ JIM RICE

Justice James C. Nelson, concurring in the result but dissenting from the reasoning.

¶36 I concur in the Court's decision to reverse the District Court and remand for entry of an order directing removal of Joukova's culvert and rock bridge. Opinion, ¶ 30. As to the remainder of the Court's Opinion, however, I respectfully, but strenuously, dissent.

¶37 Resolution of this case involves nothing more than a straightforward application of a clear and unambiguous statute, which states that "[n]o person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation or any other lawful domestic or commercial purpose, including carrying return water." Section 70-17-112(2), MCA. There is no need for the Court's lengthy excursion into caselaw—most of which does not even involve ditch easements—in order to resolve the question

19

before us. More to the point, there is no justification whatsoever for the Court's outright refusal to apply a controlling statute according to its plain language.

¶38 The majority boldly rewrites § 70-17-112(2), MCA, so that the statute's clear and unqualified prohibition, "no person may encroach upon or otherwise impair any easement for a canal or ditch," now reads: "no person may encroach upon or otherwise impair any easement for a canal or ditch, *unless the encroachment or impairment does not unreasonably interfere with the easement*." This sua sponte remaking of the statute is untenable in the extreme, and it violates any number of rules of statutory construction, not the least of which is § 1-2-101, MCA: "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Worse still, while the majority has not outright repealed the statute, the engrafted language thoroughly compromises the shield which the Legislature enacted to protect irrigators from the very sort of conduct that is at issue here.

¶39 The Legislature could not have been clearer: "No person may encroach upon or otherwise impair any easement for a canal or ditch." Section 70-17-112(2), MCA. I would simply enforce this plain and unambiguous statutory mandate and hold that Joukova's culvert and rock bridge violate the statute because—as we all agree—they encroach upon or otherwise impair MRC's easement rights. I would not embark on a discussion of common law principles, asking whether the encroachment or impairment arises to "unreasonable interference," as this consideration is not included in the statutory language and, thus, is not part of the statutory calculus.

20

## Rules of Statutory Analysis

¶40    I begin with three general observations.  First and foremost, the Court's extended discussion of common law doctrines—more specifically, cases addressing "unreasonable interference" with easements—is entirely beside the point and unnecessary, given the facts here.  At issue is a statute, § 70-17-112, MCA, the language of which is perfectly plain, clear, and unambiguous.  *See* Opinion ¶ 13.  That being the case, principles of common law, which might otherwise be applicable to the issue at hand, have been statutorily abrogated.  Section 1-2-103, MCA, states:

> The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the statutes of the state of Montana.  The statutes establish the law of this state respecting the subjects to which they relate, and their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice.

Accordingly, the Court's discussion of the common law that applies to *other* types of easements has no relevance here and is, therefore, dicta because § 70-17-112, MCA, has trumped all of that with respect to ditch easements.

¶41    Second, because the statutory language is plain, clear, and unambiguous, there is no need to resort to legislative history, as the Court does at ¶ 13.  Our rules of statutory construction are quite clear on this point.  "In interpreting a statute, we look first to the plain meaning of the words it contains.  Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation.  In this regard, words used by the legislature must be given their usual and ordinary meaning."  *Rocky Mt. Bank v. Stuart*, 280 Mont. 74, 80, 928 P.2d 243, 246-47 (1996) (citations

omitted); *see also State v. Goebel*, 2001 MT 73, ¶ 21, 305 Mont. 53, 31 P.3d 335 ("[T]here is no reason for us to engage in a discussion of the legislative history to construe [a] statute when we have determined that the language of the statute is clear and unambiguous on its face."). Here, giving the words their usual and ordinary meaning, the Legislature's intention is crystal clear from the language of the statute: no person may encroach upon or otherwise impair any easement for a canal or ditch. There is no need to consult legislative history to ascertain the meaning of these unambiguous words.

¶42    Third, because the Legislature has spoken in the clearest possible language, the Court is not at liberty to interpret the statute by reading into it language that is not there. "[O]ne of the most basic precepts governing this Court's function [is] the long-standing mandate that we must not insert what the Legislature has omitted." *Saucier v. McDonald's Rests. of Mont., Inc.*, 2008 MT 63, ¶ 70, 342 Mont. 29, 179 P.3d 481 (citing § 1-2-101, MCA). Here, the Court improperly reads into § 70-17-112(2), MCA, language of "interference" and "reasonableness" in an unnecessary and misguided attempt to "balance" property rights and create its own perception of good "public policy." Rather than simply enforce the "balance" and "public policy" that the Legislature itself has already decreed, the Court effectively legislates from the bench and amends the statute to achieve a more palatable result. I discuss these observations in further detail below.

### Application of § 70-17-112, MCA

¶43    Again, regardless of the law applicable to other types of easements, the analysis of ditch easements is governed by § 70-17-112, MCA. This statute provides, first, that "[a]

22

person with a canal or ditch easement has a secondary easement to enter, inspect, repair, and maintain a canal or ditch." Section 70-17-112(1), MCA. This is a codification of prior caselaw. In *Laden v. Atkeson*, 112 Mont. 302, 116 P.2d 881 (1941), we observed that "[a] person having an easement in a ditch running through the land of another may go upon the servient land and use so much thereof on either side of the ditch as may be required to make all necessary repairs and to clean out the ditch at all reasonable times." *Laden*, 112 Mont. at 306, 116 P.2d at 883 (internal quotation marks omitted). We explained that this is called a "secondary easement" and that it is "a mere incident of the [primary] easement that passes by express or implied grant, or is acquired by prescription." *Laden*, 112 Mont. at 305-06, 116 P.2d at 883 (internal quotation marks omitted). The rationale behind this principle is that "when the use of a thing is granted, everything is granted by which the grantee may reasonably enjoy such use, that is, rights that are incident to something else granted—here to water and ditch rights." *Laden*, 112 Mont. at 306, 116 P.2d at 883.

¶44 Next, the statute states that "[n]o person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation or any other lawful domestic or commercial purpose, including carrying return water." Section 70-17-112(2), MCA. There may be no encroachment upon or impairment of "any" easement for a canal or ditch—neither the primary easement nor the secondary easement. The prohibition on encroachment and impairment, without any qualifications or exceptions, is *more protective* than our non-ditch caselaw, which prohibits only "unreasonable interference" with an easement holder's rights. *See* ¶ 49, *infra*.

23

¶45 Here, it can be said, as a matter of law and irrefutable fact, that MRC's primary easement (the ditch itself) has been encroached upon. There is, after all, a massive obstruction right in the middle of it: Joukova's culvert and rock bridge. Nobody could plausibly or rationally suggest that this is not an "encroachment" upon the primary easement. Obviously, it is. In fact, it is the embodiment of what § 70-17-112(2), MCA, expressly prohibits. Evidently, Joukova thought that she could blatantly flout the statute and that MRC either would not pursue the matter or would lose in court. Unfortunately, she was correct as to the latter.

¶46 For reasons that are not clear from the briefs or the record, MRC has not pursued the most obvious claim it could raise: that its *primary* easement has been violated by virtue of the physical occupation of the ditch. Instead, MRC has raised only its *secondary* easement rights, as the Court notes at ¶ 10. Nevertheless, the standard is still the same: Has Joukova "encroached upon or otherwise impaired" MRC's secondary easement? Section 70-17-112(2), MCA; *see also* Opinion, ¶ 15 ("[W]e apply the same analysis whether the case concerns primary or secondary easement rights.").

¶47 At the outset, it is necessary to identify the specific secondary easement rights at issue. MRC's ditch easement was established by prescription. *See* Opinion, ¶¶ 3-4, 16. Ditch easements obtained by prescription are expressly included within the protections of § 70-17-112, MCA, as stated under subsection (4) of the statute. Furthermore, as noted, a secondary easement may be acquired by prescription. *Laden*, 112 Mont. at 305-06, 116 P.2d at 883. The Court asserts that the location and scope of this easement is governed by the common law. Opinion, ¶ 14. The truth is, however, that there is a controlling

24

statute which states that "[t]he extent of a servitude is determined by the terms of the grant or *the nature of the enjoyment by which it was acquired*." Section 70-17-106, MCA (emphasis added). We accordingly have recognized, in numerous cases, that the scope of an easement gained by prescription is defined by the character and extent of the use made during the prescriptive period. *Leichtfuss v. Dabney*, 2005 MT 271, ¶ 30, 329 Mont. 129, 122 P.3d 1220; *Kelly v. Wallace*, 1998 MT 307, ¶ 31, 292 Mont. 129, 972 P.2d 1117, and cases cited therein. Here, MRC has cleaned and maintained its ditch for the last 60 years by utilizing a bulldozer (with an eight-foot-wide blade), a backhoe, or a trackhoe through the bottom of the ditch and on the ditch banks. Maintenance begins at the point of diversion on the Musselshell River and continues through to MRC's property, a distance of several miles. As the Court acknowledges, "[t]here is no question as to the validity or existence of . . . [this] secondary easement for ditch maintenance." Opinion, ¶ 4.

¶48 Knowing the extent of MRC's secondary easement, the only question remaining is whether Joukova's culvert and rock bridge "encroach upon or otherwise impair" that easement. Section 70-17-112(2), MCA. In this regard, the Court concedes that Joukova's culvert "impair[s]" MRC's secondary easement rights. Opinion, ¶ 29. The Court also concedes that the culvert and the rock bridge are an "encroachment" upon the easement. Opinion, ¶ 24. Given these facts, there is nothing more to say. Section 70-17-112(2), MCA, has been violated. End of story.

**The Court's Approach**

¶49 The error in the Court's approach is its dogged refusal to apply the statute according to its plain language. Our cases have adopted the principle that the owner of a

25

servient estate may make use of the land in any lawful manner that she chooses, so long as the use is not inconsistent with and does not interfere with the rights reserved to the easement holder. *See City of Missoula v. Mix*, 123 Mont. 365, 372, 214 P.2d 212, 216 (1950); *Titeca v. State*, 194 Mont. 209, 214, 634 P.2d 1156, 1160 (1981); *Flynn v. Siren*, 219 Mont. 359, 361, 711 P.2d 1371, 1372 (1986); *Stamm v. Kehrer*, 222 Mont. 167, 171, 720 P.2d 1194, 1196 (1986). Subsequently, we modified this rule to prohibit only interference that is "unreasonable." *See Strahan v. Bush*, 237 Mont. 265, 268-69, 773 P.2d 718, 721 (1989); *Gabriel v. Wood*, 261 Mont. 170, 176-78, 862 P.2d 42, 45-47 (1993); *Mason v. Garrison*, 2000 MT 78, ¶¶ 47-49, 299 Mont. 142, 998 P.2d 531. No one disputes this standard, insofar as it applies to easements *other than* ditch easements.

¶50    With respect to ditch easements, however, the Legislature has abrogated that standard. The Legislature removed any subjective inquiry into the *reasonableness* of an encroachment or impairment. The Legislature determined, as a matter of public policy, that "[n]o person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation or any other lawful domestic or commercial purpose, including carrying return water." Section 70-17-112(2), MCA. Had it wanted to, the Legislature could have used the words "[n]o person may *unreasonably interfere with* any easement for a canal or ditch." The Legislature did not use those words, however. Rather, the Legislature chose a more clear, objective, and categorical prohibition: no encroachment or impairment, period.

¶51    Accordingly, whether an encroachment or impairment amounts to "interference," and whether the encroachment or impairment is "unreasonable," are not the issue. There

is no allowance in the statute for encroachments and impairments that interfere "reasonably" with the easement. Nor, for that matter, are there allowances for encroachments and impairments that are "slight and immaterial" (Opinion, ¶ 19) or "minimal" (the standard applied by the District Court). Pursuant to the plain statutory language, no person may "encroach upon" or "otherwise impair" any easement for a ditch, no matter how "reasonable," "slight," "immaterial," or "minimal" one might think the encroachment or impairment is.

¶52 Unfortunately, the Court replaces the statutory standard with its own judge-made standard, as evidenced by at least three statements in the Opinion. First, referring to Joukova's culvert and rock bridge, the Court observes that "such a permanent and immovable encroachment constitutes unreasonable interference with the easement right." Opinion, ¶ 24. It does not matter, however, whether the encroachment constitutes unreasonable interference. The fact that it is an "encroachment" means that it is *per se* in violation of the statute. Second, the Court observes that "[i]f interference is 'slight and immaterial . . . it is not objectionable.' " Opinion, ¶ 19 (ellipsis in original). What possible relevance could this statement have to the analysis unless the Court is engrafting a "slight and immaterial interference" exception onto the statute? Third, the Court states that "[s]ome permanent encroachments may not justify a finding of unreasonable interference." Opinion, ¶ 27. Again, what purpose could this statement serve except to dilute the statutory standard by creating an exception where the otherwise prohibited encroachment does not "unreasonably interfere" with the easement holder's rights?

**The Court's Fictitious Presumption that the Legislature Agrees with It**

¶53 The Court asserts that "[i]n construing the requirements of § 70-17-112, MCA, we consider our discussion and application of its provisions over the statute's thirty-year history." Opinion, ¶ 14. The Court then goes on to state that " '[w]e presume that the legislature is aware of the existing law, including our decisions interpreting individual statutes . . . . We presume that if the legislature disagreed with our interpretation . . . it would have amended the statute accordingly.' " Opinion, ¶ 14 (ellipses in original). For reasons discussed further below, I do not believe these principles are applicable in the present case. Briefly, we have not previously addressed the specific question presented here, and thus the Legislature has not yet had the opportunity to "disagree" with our statutory interpretation. But even assuming, for the sake of argument, that we have, in fact, interpreted § 70-17-112, MCA, in a way that is relevant to this case, I cannot agree with the foregoing quoted principles in any event.

¶54 As an initial matter, for purposes of clarity, the Court cites *Swanson v. Hartford Ins. Co.*, 2002 MT 81, ¶ 22, 309 Mont. 269, 46 P.3d 584, for the language quoted above about what we "presume." *See* Opinion, ¶ 14. It should be noted, however, that this language is not properly attributed to *Swanson*. Rather, the specific language quoted by the Court actually appears in a parenthetical citation to a different case—namely, *Gaustad v. City of Columbus*, 265 Mont. 379, 382, 877 P.2d 470, 472 (1994). *See Swanson*, ¶ 22. *Gaustad*, in turn, cites *In re Wilson's Estate*, 102 Mont. 178, 194, 56 P.2d 733, 737 (1936).

¶55 Second, the Court misapplies the quoted principles about what we "presume." We presume that the Legislature, *when it actually enacts legislation—*i.e., *when it*

28

*affirmatively takes action*—proceeds having in mind existing law, including this Court's interpretations of the statute or statutes at issue. *See Swanson*, ¶ 22; *Gaustad*, 265 Mont. at 382, 877 P.2d at 472; *Wilson's Estate*, 102 Mont. at 194, 56 P.2d at 737. Section 70-17-112, MCA, however, was enacted in 1981 and has never been amended. Thus, the presumption that the Legislature agrees with our interpretations of the statute is not applicable in the present case. Nevertheless, the Court perverts this principle to hold that when the Legislature *does not enact any legislation at all*—i.e., when the Legislature *takes no action whatsoever in relation to a particular statute*—the Legislature tacitly ratifies this Court's statutory construction. This proposition is without foundation in law or reason.

¶56    It is one thing for the Legislature to affirmatively enact legislation mindful of this Court's existing statutory interpretations, which is the point we made in *Swanson*, *Gaustad*, and *Wilson's Estate*. It is quite another, however, for the Legislature to do nothing at all. To presume that the Legislature's passive failure to amend a statute constitutes affirmative "agreement" with our statutory interpretation is a dangerous and untenable precedent. Notably, this is analogous to presuming that the Supreme Court's decision not to grant certiorari in a particular case means that the Supreme Court agrees with the lower court's decision; after all, following the majority's reasoning, if the Supreme Court disagreed with the lower court's decision, it would have taken the case and reversed it. Of course, it is axiomatic that the Supreme Court's denial of certiorari is

29

not a decision on the merits.[1]  And the same is obviously true regarding the Legislature's failure to amend a statute following this Court's construction of it.  There are any number of reasons why the Legislature might not take up the matter.  The Court's presumption assumes that (1) the Legislature is aware of all of our statutory interpretations, (2) the Legislature has the resources to analyze and address all of those statutory interpretations during its biennial sessions, (3) the Legislature convenes its members to decide whether they agree or disagree with this Court's various statutory constructions, and (4) when a majority of the members decline to amend a statute, it is because they affirmatively agree with what we have said.  This rationale is complete fiction and without any basis in reality.  Typically, when a statutory issue is brought to the Legislature's attention, it is because a lobbyist disagrees with one of our decisions and has determined to expend the resources to get the statute amended.  *See e.g.* Laws of Montana, 2001, ch. 229 (amending the exclusive remedy provision in the Workers' Compensation Act with the express purpose of abrogating our statutory analysis in *Sherner v. Conoco, Inc.*, 2000 MT 50, 298 Mont. 401, 995 P.2d 990).  But it is sheer folly to "presume" that when the Legislature takes *no action at all* with regard to a given statute, it must have considered what we said and agreed with it.  That is not what our discussions in *Swanson*, *Gaustad*,

---

[1] *See Evans v. Stephens*, 544 U.S. 942, 942, 125 S. Ct. 2244, 2244 (2005) (Stevens, J., respecting the denial of certiorari) ("[A] denial of certiorari is not a ruling on the merits of any issue raised by the petition."); *Md. v. Baltimore Radio Show*, 338 U.S. 912, 919, 70 S. Ct. 252, 255 (1950) (Frankfurter, J., respecting the denial of certiorari) ("[T]his Court has rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review. . . .  The one thing that can be said with certainty about the Court's denial of Maryland's petition in this case is that it does not remotely imply approval or disapproval of what was said by the Court of Appeals of Maryland.").

and *Wilson's Estate* stand for. Moreover, this approach ignores this Court's continuing obligation to interpret statutes according to their plain meaning and to correct its own mistakes. *See e.g. State v. Stiffarm*, 2011 MT 9, 359 Mont. 116, 250 P.3d 300. As a result of today's decision, however, the Legislature has been put on notice: It must apprise itself of all of this Court's statutory interpretations and, if it disagrees with a particular interpretation, it must "amend the statute accordingly" lest a failure to act be "presumed" to be affirmative agreement with what we have said.

¶57 Third, regardless of whether the Legislature's failure to amend a statute can be construed as tacit agreement with this Court's construction of the statute, our decision today implicates important access-to-justice issues. Our courts are faced with increasing numbers of ordinary citizens who must represent themselves. These individuals must be able to open the Montana Code Annotated and rely on the plain language of the statutes contained therein. Ordinary citizens should not be required—as they now are under today's decision—to obtain and sift through myriad volumes of the Montana Reports in order to ascertain whether this Court has construed a particular statute differently than its plain language, and then comb through the annals of legislative history to determine whether the Legislature has failed to amend the statute and, thereby, tacitly expressed its agreement with what we have said. For one thing, only attorneys would be aware, in the first place, that this Court occasionally construes statutes contrary to their plain language (today's decision being an example). Moreover, only attorneys would have the skills to conduct the legal research necessary to make this determination. Indeed, had MRC itself opened the Montana Code Annotated and looked at § 70-17-112(2), MCA, it would have

seen that "[n]o person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation or any other lawful domestic or commercial purpose, including carrying return water." MRC would not have known that this Court (according to today's majority opinion) has previously construed this language to mean something less rigorous than what it actually says—namely, that "no person may *unreasonably interfere with* any easement for a canal or ditch." And MRC most certainly would not have understood, as it now must, that the corollary to this rule is also true—i.e., that a person *may reasonably interfere* with an easement for a canal or ditch. It undermines the goal of access to justice, and is simply unfair, that self-represented litigants cannot rely on what the Montana Code Annotated actually says and must hire an attorney to figure out what this Court has said, and what the Legislature has not said, on the matter.

¶58    Lastly, also at ¶ 14 of the Opinion, the Court cites Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* vol. 2B, § 49:5, 32-34 (7th ed., Thomson Reuters/West 2008), for the proposition that "[j]udicial construction of a statute becomes part of the legislation from the time of its enactment." Notably, this was the same argument made by the dissent in *Stiffarm* and supported by the same authority:

> However, "judicial construction of a statute becomes part of the legislation from the time of its enactment." Norman J. Singer and J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction*, vol. 2B, § 49:5, 32-34 (7th ed., Thompson-West 2008). Whether this Court's initial construction of the statute was correct or not, it has become the law.

*Stiffarm*, ¶ 24 (Baker & Rice, JJ., dissenting). This approach, however, was decidedly *rejected* by the Court in *Stiffarm*, which held: "We conclude, however, that we cannot reconcile our duty to apply legislation as written with the decisions in these [prior] cases.

32

We accordingly expressly overrule [the prior cases]." *Stiffarm*, ¶ 18. Our decision in *Stiffarm* stands for the proposition that it is "our duty to apply legislation as written." *Stiffarm*, ¶ 18. Inexplicably, the majority disregards this rule in the present case.

¶59 In sum, even assuming, for the sake of discussion, that we have previously interpreted § 70-17-112, MCA, in a manner that is pertinent to the present case, I disagree with the propositions that the Legislature's failure to take any action in regard to our interpretation (1) justifies our "presuming" that the Legislature agrees with our construction and (2) relieves us of our duty to apply legislation as written.

### The Court's Misapplication of our Caselaw

¶60 That said, while the Court implies that we have, over the last 30 years, "discussed and applied" the provisions of § 70-17-112, MCA, in a way that is pertinent to the present case (*see* Opinion, ¶ 14), the fact is that none of the easement cases cited by the Court have addressed the specific arguments raised by MRC here. First of all, almost none of the cited cases involved a secondary ditch easement or, more specifically, the application of § 70-17-112, MCA. Their irrelevance, therefore, is self-evident.[2] Secondly, the two

---

[2] Nevertheless, I note the following. *Mattson v. Mont. Power Co.*, 2009 MT 286, 352 Mont. 212, 215 P.3d 675, involved a claim that the dominant tenement was causing unreasonable damage to, and interference with, the servient landowners' properties along Flathead Lake due to the manner in which it was operating Kerr Dam. **No ditch easement was at issue; no statute prohibiting encroachment or impairment was at issue.** *Flynn v. Siren*, 219 Mont. 359, 711 P.2d 1371 (1986), *Stamm v. Kehrer*, 222 Mont. 167, 720 P.2d 1194 (1986), *Strahan v. Bush*, 237 Mont. 265, 773 P.2d 718 (1989), and *Gabriel v. Wood*, 261 Mont. 170, 862 P.2d 42 (1993), each involved a gate placed by the servient landowner across a primary easement, namely, an ingress/egress road leading to the dominant landowner's property. **No ditch easement was at issue; no statute prohibiting encroachment or impairment was at issue.** *Titeca v. State*, 194 Mont. 209, 634 P.2d 1156 (1981), also involved a primary easement for ingress to/egress from the

33

cited cases that did involve a ditch easement (discussed below) are readily distinguishable from the present case. Before discussing those cases, however, it is necessary first to review what MRC is specifically arguing on appeal:

■ "The Ditch Owners have grave concerns over the District Court's reliance on an alleged 'minimal' hindrance standard of their rights under § 70-17-112, MCA. The plain language of the statute does not allow for any encroachment or impairment of irrigation ditch owners' secondary easement rights on the basis that the encroachment only 'minimally' interferes with ditch maintenance."

■ "The plain language of § 70-17-112, MCA, prohibits *any* impairment or encroachment of a ditch owner's secondary easement rights without the ditch owner's permission. . . . [T]he Court cannot insert 'what has been omitted or to omit what has been inserted.' Section 1-2-101, MCA." (Emphasis in original.)

■ "The District Court inserted a standard into § 70-17-112, MCA, that cannot be found in the plain language of the statute. . . . [T]he District Court found Joukova's culvert/rock bridge to have 'hindered' the Ditch Owners' ability to clean the Ditch. Yet, the court went one step too far in justifying Joukova's hindrance by qualifying the impairment as minimal—inserting a 'minimal' standard into § 70-17-112, MCA. Nowhere in § 70-17-112, MCA, is there an allowance for minimal encroachment or impairment of a secondary easement right."

■ "Joukova has provided no authority—either statutory or common law—that the District Court is entitled to insert a 'minimal' standard into § 70-17-112, MCA. This is for good reason, as no such authority exists. Section 1-2-101, MCA, prevents district courts from inserting words into statutes. Here, the plain language of § 70-17-112, MCA, controls the resolution of this dispute: '[n]o person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation . . . .' The District Court's insertion of a 'minimal'

---

dominant landowner's property, which the servient landowner proposed to pave and open to the public. **No ditch easement was at issue; no statute prohibiting encroachment or impairment was at issue.** *Beiser v. Hensic*, 655 S.W.2d 660 (Mo. App. E. Dist. 1983), and *Marsh v. Pullen*, 623 P.2d 1078 (Ore. App. 1981), are out-of-state cases that involved access roads. **No ditch easement was at issue; no statute prohibiting encroachment or impairment was at issue.** *Hatfield v. Ark. W. Gas Co.*, 632 S.W.2d 238 (Ark. App. 1982), also an out-of-state case, involved access to a gas line easement, but **no statute prohibiting encroachment or impairment was at issue**.

standard (in violation of § 1-2-101, MCA) to the statute must be reversed." (Ellipsis and brackets in original.)

As will be seen, neither of the ditch cases cited by the Court addressed these arguments, as they were not made in those cases. The present case is the first in which we have been squarely presented with the question whether some encroachments or impairments are acceptable while others are not. It is bad enough that the Court answers this question incorrectly. It is worse that the Court cloaks its erroneous answer in the mantle of prior cases which did not even confront the question directly.

¶61    First, in *Boylan v. Van Dyke*, 247 Mont. 259, 806 P.2d 1024 (1991), the servient landowners (the Van Dykes) constructed a one-acre pond on their land. To do so, they placed a dam across Boylan's irrigation ditch (the Tudor Lane Ditch)—a patent violation of his primary easement, incidentally. Boylan then filed suit, "claiming that construction of the pond interfered with his ditch right to transport irrigation water down the Tudor Lane Ditch." *Boylan*, 247 Mont. at 261-62, 806 P.2d at 1025. The district court correspondingly framed the issue as "whether the pond interfered with Mr. Boylan's use of the Tudor Lane Ditch, and if so, what the damages were." *Boylan*, 247 Mont. at 262, 806 P.2d at 1026. After personally examining the pond and the ditch, the judge concluded that "the Complaint of the plaintiff that they were deprived of the waters of Spring Creek is dispelled." *Boylan*, 247 Mont. at 263, 806 P.2d at 1026. Bottom line, "Mr. Boylan failed to present any evidence to support his claims of unlawful interference." *Boylan*, 247 Mont. at 266, 806 P.2d at 1028. On appeal, Boylan maintained that "the construction of the pond was an unlawful interference with his ditch

35

easement" because "the pond deprived him of irrigation water for his land and reduced the value of his land to half of what it was worth prior to construction of the pond and the destruction of his ditch." *Boylan*, 247 Mont. at 264, 806 P.2d at 1027. "After reviewing the record in this case," however, we concluded that "there is no evidence to support Mr. Boylan's claims." *Boylan*, 247 Mont. at 264-65, 806 P.2d at 1027.

¶62 The Court misstates our holding in *Boylan*, citing it for the propositions that "uses not affecting the dominant owner's use of an easement will not trigger a finding of *unreasonable* interference," Opinion, ¶ 22 (emphasis added), and "[s]ome permanent encroachments may not justify a finding of *unreasonable* interference," Opinion, ¶ 27 (emphasis added). The word "unreasonable," however, does not appear anywhere in the *Boylan* decision. In point of fact, we never considered whether the interference alleged by Boylan was "unreasonable." Rather, we concluded that he had simply failed to show "interference" at all. And this is why *Boylan* contributes nothing to the statutory analysis in the present case. At no point in that decision did we address whether a "reasonable" or "minimal" encroachment or impairment is permissible under the statute. While Boylan certainly could have pursued the claims which MRC has pursued here, given that the Van Dykes had erected a dam and created a pond in the ditch, Boylan merely claimed that the dam and pond deprived him of irrigation water for his land and reduced the value of his land. The district court found this to be factually unsupported. We likewise found no evidence to support Boylan's claims. The only point where we even purported to apply § 70-17-112, MCA, was in granting costs and attorney's fees to the Van Dykes as the "prevailing party." *Boylan*, 247 Mont. at 267, 806 P.2d at 1029.

36

¶63 The second case, relied on heavily by the Court, is *Engel v. Gampp*, 2000 MT 17, 298 Mont. 116, 993 P.2d 701. *See* Opinion, ¶¶ 15, 18, 19, 25, 31. As author of the *Engel* opinion, however, I can state with assurance that we did *not*, in that case, address the arguments under consideration here. Contrary to the Court's insinuations, there was no question raised as to whether an encroachment upon or impairment of a secondary ditch easement violates § 70-17-112, MCA, no matter how "minimal" or "reasonable" it is. In fact, the district court in *Engel* concluded that the Gampps had "encroached upon and impaired" Engel's secondary easement, and no one disputed that conclusion on appeal. And there certainly was no discussion of whether the encroachment and impairment were "unreasonable"—the Court's misreading of *Engel* notwithstanding. Indeed, the primary question in the case was whether Engel had "prevailed" on her claims in the district court, thus justifying an award of costs and attorney's fees. *Engel*, ¶ 10. This necessitated a discussion of what her claims were, how the district court analyzed those claims, and whether she prevailed on them—nothing more. *Engel*, ¶¶ 34-47.

¶64 *Engel* involved a ditch easement which began at the western end of the Gampps' property and flowed north, northeast, and then east, eventually passing through Engel's adjacent property. *Engel*, ¶ 12. The issue prompting the litigation concerned Engel's secondary access easement. There was a footpath along the ditch that was used for such purposes as regulating the head gates, cleaning out the ditch, and routine inspection. *Engel*, ¶ 12. This footpath was Engel's *principal* secondary easement for accessing the ditch. The problem was that vehicles could not use this route, and some of the repair and maintenance work required vehicular access. *Engel*, ¶¶ 13-14. Engel thus claimed she

37

had an *alternate* secondary easement which allowed her to drive vehicles across the Gampps' property. *Engel*, ¶¶ 6, 17. Engel based this claim on "historic use"; however, she failed to show that she had ever attempted to establish, maintain, or improve a vehicle route over the Gampps' property. *Engel*, ¶¶ 17, 44. Furthermore, any such historic use would have involved negotiating a gate, which was usually locked, at the boundary of the Gampps' property. Engel's husband had put this gate in place back when the Engels held both their own property and the Gampps' property in common ownership, and he required that ditch users notify him before accessing the property. *Engel*, ¶ 18.

¶65 Accordingly, the district court concluded that Engel's secondary easement was along the footpath. *Engel*, ¶¶ 24, 41. The district court rejected her claim of an *existing* secondary easement across the Gampps' property based on historic use. *Engel*, ¶ 44. Instead, recognizing that vehicular access to the ditch was occasionally necessary, the district court established a "new, additional" secondary easement across the Gampps' property that she could use for this purpose. *Engel*, ¶¶ 24, 37, 41-44, 46. The district court defined the location and scope of this "new" easement by what the court thought was reasonably necessary for Engel and not unduly burdensome to the Gampps. *Engel*, ¶¶ 24, 44, 50, 52-55. The scope of this "new" easement *included* the gate at the boundary of the Gampps' property. *Engel*, ¶¶ 24, 46, 55. Hence, *Engel* was not a "gate case" (Opinion, ¶ 25) in the sense that a physical obstruction was placed across a formerly unobstructed access route. The gate was always there. It was within the scope of the secondary easement.

¶66 The district court concluded, however, that the Gampps had "encroached upon and impaired" Engel's secondary easement rights by intimidating and threatening her and by keeping the gate locked when she needed access. *Engel*, ¶¶ 25, 34, 47. Significantly, there was no discussion whatsoever by the district court as to whether this encroachment and impairment was "unreasonable" or "minimal." Nor was there any discussion by this Court as to whether the Gampps' conduct amounted to "unreasonable interference" with Engel's secondary easement. The fact of the impediments was sufficient to violate the statute. *See Engel*, ¶¶ 36, 38, 47.

¶67 The Court's entire discussion (in the present case) of "the common law" of easements is premised on our citations in *Engel* to *Laden v. Atkeson*, 112 Mont. 302, 116 P.2d 881 (1941), and *Gabriel v. Wood*, 261 Mont. 170, 862 P.2d 42 (1993). Opinion, ¶¶ 14-15. As an initial matter, it should be noted that the Court misstates our citation to *Gabriel* in *Engel*. In *Gabriel*, which involved an obstruction to a primary easement (an ingress/egress road), we said that "a gate may be constructed across the easement if it . . . does not interfere with reasonable use of the right-of-way." 261 Mont. at 177, 862 P.2d at 46. The Court, at ¶ 15 of the Opinion, quotes part of this language, but changes the word "a gate" to "any obstruction of an easement" (a dubious rewriting of *Gabriel* in itself), italicizes the word "reasonable" for added emphasis, and then, shockingly, attributes this passage as "our observation" in *Engel*. However, we did not "observe" in *Engel* that "any obstruction of an easement must not interfere with *reasonable* use of the right-of-way." Opinion, ¶ 15 (emphasis in original, internal quotation marks omitted). This is a blatant rewriting of that case. The proposition for which we cited *Gabriel* in

39

*Engel* was this: "a servient owner may maintain a locked gate across an easement so long as it does not 'interfere with the use and right reserved to the dominant tenement or estate.'" *Engel*, ¶ 50 (quoting *Gabriel*, 261 Mont. at 176, 862 P.2d at 45). Contrary to the Court's discussion at ¶ 15 of the Opinion, we did not qualify the word "interfere" with the word "reasonable."

¶68 More importantly, our citations to *Laden* and *Gabriel* in *Engel* concerned the rules for defining the location and scope of a secondary easement in the first instance. We did not cite *Laden* or *Gabriel* for the Court's proposition here that "the common law" controls over the plain and unambiguous language of § 70-17-112(2), MCA. Engel had complained that the district court should have enjoined the Gampps from interfering with her alternate secondary easement. *Engel*, ¶¶ 48, 50. Recall that the district court had only just determined the parameters of that "new" easement within the context of the *Engel* case. *Engel*, ¶ 42. We noted, however, that "[t]here is substantial evidence that Engel's access for routine inspections and maintenance is, and always has been, 'free and uninterrupted,' contrary to her assertion on appeal." *Engel*, ¶ 50. Then, after citing *Gabriel* for the foregoing proposition (that a servient owner may maintain a locked gate across an easement, so long as it does not interfere with the use and right reserved to the dominant tenement), we observed that the district court had fashioned Engel's "new" secondary easement for vehicular access, with the allowance for a locked gate, so that the Gampps would not be unreasonably burdened. *Engel*, ¶ 50.

¶69 In other words—and this is the critical aspect of *Engel* that is apparently lost on the Court today—the gate and the fact that it could be locked were an integral component

40

of Engel's alternate secondary easement. Engel could not claim interference with her easement based on the locked gate for the simple reason that she never had the right to unfettered access in the first place. Of course, the Gampps were required to unlock the gate upon receiving notice that Engel needed to access the ditch over their property. *Engel*, ¶ 52. But a careful reading of *Engel* shows that our discussion at ¶¶ 50-52 stands for the unremarkable proposition that a gate, which is kept locked except when Engel serves notice that she needs access, is an inherent limitation on her alternate secondary easement. This is an important distinction from the present case, where the culvert and bridge were never an inherent limitation on MRC's secondary ditch easement. Rather, MRC's easement—the validity of which is not in dispute, and the location of scope of which are not at issue—entitles MRC to an obstructed ditch, the entire length of which can be maintained with a bulldozer as established through prescriptive use.

¶70 Accordingly, there are two points to be understood about *Engel*. First, we did not hold that some interference with a ditch easement is acceptable under the statute while other interference is not, depending on what we think is "reasonable." We were not presented with that argument. Moreover, Engel's claim of "interference" had no merit anyway, given that the access restrictions about which she complained were within the scope of her "new" alternate secondary easement as fashioned by the district court. Second, we did not hold, or even intimate, in *Engel* that the touchstone of analysis under § 70-17-112(2), MCA, is "unreasonable interference." Rather, the Court today manufactures that proposition out of whole cloth, despite the unambiguous statutory prohibition against encroachments and impairments *of any kind*.

41

¶71 In this regard, it is noteworthy that the Court, at ¶ 23, summarily dismisses two precedents that contradict its approach here. In *Kephart v. Portmann*, 259 Mont. 232, 855 P.2d 120 (1993), after the Portmanns exercised their right to enter, repair, and maintain their ditch under § 70-17-112(1), MCA, the Kepharts filed suit and thereby forced the Portmanns into court to defend the existence of the ditch right and corresponding secondary easement. We held that "the Kepharts' lawsuit constituted an impairment of the Portmanns' easement under § 70-17-112(2), MCA." *Kephart*, 259 Mont. at 239, 855 P.2d at 124. The words "unreasonable interference" appear nowhere in our decision. Likewise, in *Byrum v. Andren*, 2007 MT 107, 337 Mont. 167, 159 P.3d 1062, after the easement holders accessed their ditch for maintenance purposes, the Byrums filed suit alleging trespass. We held that the filing of the trespass claim "impaired and interfered" with the easement holders' rights under § 70-17-112, MCA. *Byrum*, ¶ 50. Nowhere did we analyze whether this impairment and interference was "unreasonable." The fact of impairment and interference was enough—as the statute contemplates.

¶72 The Court contends that our reasoning in *Byrum*, ¶ 46, is contrary to the statute's "hard-and-fast" rule. Opinion, ¶ 31. Again, as author of the *Byrum* opinion, I can state with assurance that we did *not*, in that case, address the arguments under consideration here. Moreover, what we held in the cited paragraph of *Byrum* was simply this:

> Respondents allege physical interference [with their ditch rights], namely that Byrums had continually confronted Respondents while they attempted to maintain the Ditch, blocked Respondents from accessing the headgate, and verbally harassed Respondents. The District Court found that the Byrums had not denied Respondents access to the headgate and had not

prevented water from being conveyed down the Ditch. Testimony from trial indicates that the Byrums did occasionally block Respondents from using the headgates on the Ditch, but that the Byrums eventually allowed access. Evidence in the record supports the District Court's finding that Byrums did not physically deny Respondents' access to the headgate. The court's finding is supported by substantial evidence and is not clearly erroneous in this regard.

*Byrum*, ¶ 46. We were not presented with and did not address the question whether some interference is reasonable while other interference is not.

¶73 But even if it *could* be said that *Byrum*, or any of our other cases, is authority for the Court's approach of engrafting language onto a clear and unambiguous statute (which I do not believe to be the case), then our cases are wrong and should be corrected, not perpetuated. *State v. Stiffarm*, 2011 MT 9, ¶ 18, 359 Mont. 116, 250 P.3d 300 ("[W]e cannot reconcile our duty to apply legislation as written with the decisions in these [prior] cases. We accordingly expressly overrule [the prior cases]."). As Winston Churchill is reported to have said: "If you simply take up the attitude of defending a mistake, there will be no hope of improvement."

¶74 In sum, the Court cherry-picks and misquotes language from a variety of cases— most of which have nothing to do with ditch easements—to justify its foray into "the common law" and its application of an "unreasonable interference" standard in lieu of the statutory "no encroachment or impairment" standard. The fact is that none of the foregoing cases is authority for the Court's holding that an encroachment upon or impairment of a ditch easement is permissible, notwithstanding § 70-17-112(2), MCA, if the encroachment or impairment interferes reasonably with the easement holder's rights. More to the point, none of our cases stand for the proposition that we may dilute the clear

43

and unqualified statutory standard in favor of our own subjective "reasonableness" analysis.

### "Public Policy" and "Balancing"

¶75 As a final matter, I cannot agree with basing our decision on what we think is the better "public policy." Opinion, ¶ 28. On the subject of ditch easements, the Legislature has spoken. It has taken the decision out of our hands and has set the standard that is to apply. *See* § 1-2-103, MCA. "No person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation . . . ." Section 70-17-112(2), MCA. Whether there is interference, and whether that inference is unreasonable, is not part of the statutory calculus and, thus, is not relevant. I would simply apply the plain language of the statute, not try to improve upon it based on our own notions of what is good "public policy."

¶76 For the same reason, I cannot agree with the premise that we must "balance" property rights in this case. *See* Opinion, ¶¶ 18, 19, 25. There is no "balancing" for the courts to do when a party holds a ditch easement. The Legislature has already struck the "balance" that it has determined is appropriate: no person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation, period. We are wrong to tweak this language by inserting a "balancing" requirement where the Legislature has already decided that the balance weighs in favor of the irrigator.

¶77 In this regard, the Court's statement that "Joukova cannot be deprived of her rights to use her land currently accessed via the rock bridge," Opinion, ¶ 30, is simply wrong; of course she can. Joukova bought her land in 2006 subject not only to MRC's preexisting

ditch easement, but also to Montana statutory law which states that "[n]o person"—Joukova included—"may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation." Section 70-17-112(2), MCA. Hence, Joukova never even had, in the first place, a right to use her land in any manner that involved encroaching upon or otherwise impairing MRC's easement rights. Indeed, most of Joukova's problems are of her own making and her ignoring the remedy which the statute provides. She should not now be heard to complain. As we stated over 60 years ago,

> [i]t is a rather specious argument to say that the [servient landowner] may not use this land as it desires to do, because of the burden imposed by the [easement] and therefore the burden must be lightened. One may not invade the property rights of another and justify or attempt to excuse or explain such legal wrong because of the need. The answer thereto is that the [servient landowner] knew of the limitations imposed on this property at the time it purchased, so it is assumed the [servient landowner] received what it paid for. If it desires the full unrestricted fee another conveyance is called for.

*City of Missoula v. Mix*, 123 Mont. 365, 372, 214 P.2d 212, 216 (1950). "Balancing" of Joukova's rights is simply inapplicable to this case. She received what she paid for: land that is burdened by a ditch easement which she may not encroach upon or otherwise impair. If she can figure out how to use her land without violating MRC's ditch easements, she is free to do so.

### Conclusion

¶78    In conclusion, I cannot agree with the Court's analysis. As a matter of undisputed fact, the Court acknowledges that we are dealing with an "obstruction" that constitutes an "encroachment" upon MRC's ditch easement and that "impairs" MRC's secondary easement rights. Opinion, ¶¶ 24, 29. That is the end of the inquiry. Joukova's rock

45

bridge and culvert violate the statute and must be removed. Whether the bridge and culvert "unreasonably interfere" with the ditch easement (passim), whether such interference is "no more than necessary to achieve a reasonable balance of the parties' property rights" (Opinion, ¶ 25), whether the bridge and culvert constitute a "major" imposition on MRC's maintenance activities (Opinion, ¶ 24), whether the bridge and culvert cause "material inconvenience" to MRC (Opinion, ¶ 29), whether the bridge and culvert were "expensive" to install (Opinion, ¶ 26), and whether the bridge and culvert are "difficult" to remove (Opinion, ¶ 26) are all totally and completely irrelevant. The statute is violated by virtue of the encroachment and impairment. End of story.

¶79 But instead of enforcing the plain and unambiguous language that the Legislature has chosen, the Court has modified that language to allow for "interference" that is "reasonable." Effectively, what the Court has done is reintroduce into the law of ditch easements a subjective "reasonableness" inquiry that the Legislature specifically removed from the analysis of encroachments and impairments upon ditch easements entirely.

¶80 And, lest there be any doubt, the Court's "unreasonable interference" approach is not limited to secondary easements. As the Court states at ¶ 15, "we apply the same analysis whether the case concerns primary or secondary easement rights." What this means is that had MRC objected that Joukova's culvert and rock bridge violate MRC's *primary* easement (which they do, by virtue of encroaching upon the ditch), MRC would still have to show that this encroachment "unreasonably interferes" with its easement rights because, as the Court states at ¶ 27, "[s]ome permanent encroachments may not

46

justify a finding of unreasonable interference." This is so deliberately contrary to the statutory mandate as to be absurd.

¶81 From a broader perspective, in its attempt to "balance" property rights and create its own "public policy," the Court has now placed farmers and ranchers who depend on irrigation rights and the ability to access and maintain irrigation ditches—the life's blood of their operations—in an untenable position. As a result of today's Opinion, a servient landowner no longer needs to meet with the holder of a canal or ditch easement in order to negotiate the easement holder's written consent to the desired encroachment or impairment (*see* § 70-17-112(3), MCA). Instead, the servient landowner can simply encroach upon and impair the ditch easement at will, so long as she does not "unreasonably interfere" with it.

¶82 There is no reason, much less any legal basis, why owners of canal or ditch easements should have to defend, as they henceforth must, their statutory easement rights from the "interference" (reasonable or otherwise) of every hobby rancher with 20 acres and a horse. In this regard, I agree with MRC's observations in its reply brief:

> The statute does not allow for any encroachments or impairments without written permission for good reason. Under the District Court's "minimal" standard [and now this Court's "unreasonable interference" standard], any landowner through which a canal is located may employ self-help by changing the character of a ditch without court approval, or at a bare minimum, permission of the easement holders. Based on the District Court's holding [and now this Court's holding], a landowner may install an obstruction in a ditch without permission. The ditch owner's only recourse is to go to court and file suit to have the obstruction removed. This "shoot first, ask forgiveness later" method of self-help was not contemplated by the Legislature in § 70-17-112, MCA. This is especially evident in the fact the Legislature prescribed a clear method for obtaining a ditch owner's

47

permission to impair or encroach the ditch owner's secondary easement rights. Section 70-17-112(3), MCA.

¶83 While the majority admonishes this Dissent that the law obliges dominant and servient landowners "to be reasonable with one another," Opinion, ¶ 31, the failing of the Court is its intransigent refusal to recognize that the law requires no such thing. Indeed, the overriding obligation of dominant and servient landowners is, first, to each follow the law! Here, MRC followed the law in exercising its easement rights in the manner it had for over 60 years. Joukova, on the other hand, had her statutory remedy—obtaining written consent from MRC for her encroachment upon their ditch easement and the corresponding impairment of their secondary easement—and she blatantly ignored that process. Joukova thumbed her nose at § 70-17-112(3), MCA, and arrogantly planted her culvert and rock bridge squarely in the middle of the irrigation ditch that MRC depended upon for the life's blood of its haying and cattle operations. So much for reasonableness!

¶84 The majority drapes itself in the mantle of history—or, more accurately, revisionist history. In point of fact, until today, Montana's farmers, ranchers, and irrigators were not burdened with the necessity of having to shut down their seasonal ditch maintenance operations to deal with and, ultimately, litigate with hobby ranchers, second-home owners, the rich and famous, and others who blatantly flout the statute that the Legislature enacted to prevent precisely the conduct which this Court now decrees must be reasonably accommodated in the interests of neighborly harmony. A more wrong-headed and perverse result is difficult to imagine.

48

¶85 At the risk of its inaction being deemed by this Court as agreement with our decision in this case (Opinion, ¶ 14), it will, no doubt, be left to the next session of the Legislature to amend § 70-17-112, MCA, to make it *even more* clear and plain that "no encroachment" and "no impairment" really does mean "no encroachment" and "no impairment" and that there are not implicit exceptions for encroachments and impairments that the courts and servient landowners believe "interfere reasonably" with the ditch owner's rights. In that respect, at least, I suspect that the lobby for farmers, ranchers, and irrigators is a good deal more dynamic than whatever the hobbyists will be able to put up.

¶86 While I concur in the Court's decision to reverse the District Court, I otherwise strenuously dissent from the Court's Opinion.

/S/ JAMES C. NELSON